

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-3-2001

# Abramson v. William Paterson

Precedential or Non-Precedential:

Docket 00-5026

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Abramson v. William Paterson" (2001). *2001 Decisions.* Paper 173.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/173

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 3, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-5026

GERTRUDE W. ABRAMSON,
        Appellant

v.

WILLIAM PATERSON COLLEGE OF NEW JERSEY

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 95-cv-04353)
District Judge: Honorable Katharine S. Hayden

Argued January 25, 2001

Before: NYGAARD, ALITO, and RENDELL, Circuit  Judges,

(Filed: August 3, 2001)

        Phyllis Gelman
        Lindsay N. Feinberg [ARGUED]
        Gelman & Feinberg
        60 East 42nd Street, Suite 1060
        New York, NY 10165
        Counsel for Appellant
        Gertrude W. Abramson

Nathan Lewin [ARGUED]
Miller, Cassidy, Larroca & Lewis
2555 M Street, NW, Suite 500
Washington, DC 20037
Counsel for Amicus-Appellant
National Jewish Commission
on Law and Public Affairs ("COLPA")

Bruce J. Solomon [ARGUED]
Office of Attorney General of
 New Jersey
Division of Law
Richard J. Hughes Justice Complex
Trenton, NJ 08625
Counsel for Appellee
William Paterson College of
New Jersey

OPINION OF THE COURT

RENDELL, Circuit Judge.

Gertrude Abramson appeals the summary judgment granted to her former employer, William Paterson College ("WPC"),1 against whom she filed hostile work environment, religious discrimination, and unlawful retaliation claims under Title VII and the New Jersey Law Against Discrimination ("NJLAD"). Abramson, former tenure-track Associate Professor in the Department of Curriculum & Instruction ("C&I") of the School of Education at WPC, claimed she was subjected to harassment and ultimately terminated, both because of her Orthodox Jewish beliefs and practices, and because she complained of WPC's religious discrimination against her. The District Court granted summary judgment in favor of WPC on all claims, and Abramson now appeals. We conclude that Abramson established a prima facie case for all three causes of action, and that the District Court erred in the way that it

_____

1. WPC, now the William Paterson University of New Jersey, is an undergraduate and graduate educational institution, and is a state college of New Jersey.

2

considered the evidence and applied certain legal principles. We will therefore reverse the grant of summary judgment and remand for further proceedings.

I.

A. Facts

Most of the underlying facts are undisputed. Where there is a dispute, we view the facts in the light most favorable to the plaintiff. Drinkwater v. Union Carbide Corp. , 904 F.2d 853, 854 n.1 (3d Cir. 1990). WPC hired Abramson, an Orthodox Jew, for one year as a tenure-track Associate Professor, effective September 1, 1990. Abramson has a Doctor of Education degree in Communications, Computing and Technology from Columbia University, and New York State teacher certifications in elementary education and early childhood education. In 1990, she had been teaching for ten years at the college level, had published in peer-reviewed academic publications, and had a national reputation in education technology. At the time WPC hired her until her termination, Abramson was the only Orthodox Jew employed in the School of Education at WPC.

At the start of her first year at WPC, Abramson informed her Department Chair, Jim Peer, that she would not be able to teach on Jewish holidays. He suggested that she work out her schedule with her students, which she did, and the days she missed on account of Jewish holidays were not counted as sick days. App. at 134-35.

The Review Process

As part of WPC's written policies and procedures regarding retention and tenure, an untenured professor's academic performance was to be reviewed on an annual basis. New Jersey state law does not allow a state college to offer tenure to a faculty member upon appointment, but does permit it to offer tenure to a professor after two years of employment upon a showing of extraordinary circumstances. N.J. Stat. Ann. S 18A:60-9 (West 1993). Barring exceptional circumstances, an untenured faculty

member must serve five years before being considered in the fifth year for an award of tenure made effective in his or her sixth year of employment. Id. atS 18A:60-8.

Retention and tenure decisions in Abramson's department are first considered by the Curriculum and Instruction Retention Committee ("the Committee"). The criteria used to determine retention and tenure, as set forth in WPC's written retention policy, are as follows: (1) professional performance; (2) professional growth; and (3) potential contributions to the academic department and the University in terms of present and future programs. The Department Chair is an ex-officio member of the Committee. Though not a voting member, the Chair does choose whether or not to sign the Committee's recommendation. App. at 707. By not signing a recommendation, the Chair indicates a lack of support for the Committee's evaluation. App. at 708. The Dean then makes a recommendation to the Provost. Finally, the President of WPC makes a determination whether or not to recommend retention (or tenure, where applicable) to the Board of Trustees. The WPC Board of Trustees then decides whether to retain and/or grant tenure based on the recommendation of the President.

Abramson's First Two Years at WPC

Abramson's first "annual" review occurred shortly after she began teaching at WPC, and on November 7, 1990, the Committee "strongly" recommended the retention of Abramson for the 1991-92 academic year. App. at 203. The Committee applauded her teaching, scholarly achievement and service, and noted Abramson's ability to teach many C&I courses, opining that "[t]his flexibility makes her most valuable for future planning." Id. It went on to say that the C&I Department "has long been in need of just such expertise as Professor Abramson brings . . . [WPC] stand[s] to benefit from her work as a teacher and scholar." Id.

In the fall of 1991, during Abramson's second year at WPC, Nancy Seminoff became the Dean of WPC's School of Education, and in October 1991, she appointed Shelley Wepner to chair the C&I Department. On October 29, 1991,

4

the Committee recommended the retention of Abramson for the 1992-93 academic year, and Dean Seminoff concurred. The Committee noted Abramson's significant service, top teaching ratings by her peer evaluators, and exemplary scholarship. It stated that "Professor Abramson exemplifies WPC's direction for the future." App. at 207. Once again, it strongly recommended her retention, and Wepner signed the recommendation. President Speert then recommended Abramson's reappointment to the Board of Trustees. App. at 204.

Abramson's Third Year at WPC

During Abramson's third year, she began to experience difficulties. First, Abramson was charged for sick days for each day of work she missed due to Jewish holidays, despite the fact that WPC was closed on several Christian holidays. App. at 13, 135, 159. In June 1992, after Abramson submitted routine forms in connection with a professional conference she would be attending during that summer, Seminoff required Abramson to meet with her to account for the number of conferences and absences in the prior year. Linda Dye, the head of the faculty union, stated that this was "unprecedented" in a situation where a professor's absences had not exceeded the standards set by Human Resources. App. at 157-58.

In addition, Abramson was charged a day of sick leave for a Jewish holiday on October 20, 1992, when she was not even scheduled to teach. App. at 250, 677. After protesting orally and in writing, this error was corrected six months later. App. at 685. Then, in November 1992, during a C&I Department meeting called to plan the 1993-94 class schedules, Abramson stated her intention to schedule her classes so that they did not conflict with the fall Jewish holidays. According to Abramson, "Wepner started to scream that she was tired of hearing about [Abramson] and [her] holidays; when [Abramson] quietly tried to explain [her]self, Chair Wepner yelled that [Abramson's] holidays were . . . personal private issues and that she did not want them mentioned at the scheduling meetings." App. at 137.

During the fall of 1992, at a Technology Committee

5

meeting chaired by Seminoff, Wepner suggested that Abramson, along with others, come in on a Saturday to prepare a technology room. Wepner, who is Jewish herself, made this suggestion while fully aware that Abramson does not work on Saturdays. Abramson told the group that she could not attend because of the Jewish Sabbath. 2 Thereafter, Wepner continually questioned Abramson about her lack of availability on Friday nights and Saturdays. App. at 137–38.

On October 12, 1992, the Committee once again recommended Abramson for retention for the 1993–94 school year. The evaluation highlighted the "dynamic" nature of Abramson's discipline, described her as a"caring educator" and "reflective teacher," noted she engaged in a "wide range of scholarly activity" and was"active in several national conferences in her field." App. at 225–28. This time, however, the Committee's evaluation noted some "minor concern about her teaching performance and her contribution to department activities . . . ." App. at 231. However, it also "recognized her numerous scholarly pursuits and professional contributions" and recommended her retention "in light of the department's present and future needs for a technology educator." Id. Wepner signed the recommendation. Seminoff, noting "an imbalance in productivity" due to Abramson's focus on scholarly activity, expressed that she had "serious concerns about Dr. Abramson's reappointment," and recommended Abramson "with some reservation." App. at 929–30.

On October 22, 1992, Abramson wrote a seven-page letter to President Speert, stating that she took"strong exception to the negative tenor and substance of the recommendations made for [her] retention by[her] department and Dean Seminoff." App. at 1253. She went on to write, "I have lived as an Orthodox Jew all my life . . . . The non-discrimination policy of William Paterson College precludes the need to defend either religious observances or pursuit of career goals." Id. Abramson attached the July 12,

_____

2. In conformity with her religious beliefs, Abramson does not work, use the telephone or drive a car from sundown on Friday until approximately one hour after sundown on Saturday.

1992 letter she had sent to Seminoff in response to the Dean's request for an explanation of her absences. App. at 1261. She received no response from Speert, and she has asserted that his demeanor toward her changed dramatically after that. Instead of being friendly as he was previously, he "stopped speaking to [her] and would turn on his heel and walk away from [her] if [they] happened to meet on campus." App. at 140. On October 30, 1992, President Speert informed Abramson that he intended to recommend her for retention for a fourth year. App. at 931.

In a March 1993 meeting, Wepner scheduled an annual C&I Department lunch for May on a Jewish holiday, even after Abramson informed her she could not attend. App. at 137. On April 1, 1993, Wepner's secretary commented to Abramson, in the presence of Wepner, that "other faculty members are complaining about the way your religious absences inconvenience them"; Wepner did not comment. Id.

On April 27, 1993, Abramson sent a letter to Speert, the Provost, her union representative, the Chair of the Faculty Senate, and the entire Board of Trustees. App. at 939. She attached the letter she had written to Seminoff after their meeting on March 23, 1993, a meeting that Abramson said was another event in a series of "continued and unwarranted negativism toward [her]." App. at 940. The attached letter refuted Seminoff 's suggestions and criticisms regarding Abramson's teaching, leadership, professionalism, and collegiality, and said it was written to "counter the negative `facts' [Seminoff] continue[d] to disseminate about [her]." App. at 939. The letter accused Seminoff of having "ill-concealed hostility" toward Abramson and of having a management style that "stifles collegiality, deprives the departments and the college of faculty creativity . . . and reduces innovative and effective teaching." App. at 947. Abramson testified in her deposition that this letter was sent to "challenge the judgment of the Dean." App. at 1070.

On April 28, 1993, Provost Smith wrote a letter to Abramson stating that it was highly unprofessional for her to circulate such a letter so widely. App. at 1072-73. Abramson, however, continued to circulate letters that were

harshly critical of Dean Seminoff. On June 7, 1993, she wrote a letter to Seminoff attacking her for "applying an administrative style that is autocratic and confrontational and is based upon an outmoded, discredited, paternalistic, approach to management." App. at 1076-77. Abramson's letter added, "I have not seen any substantive evidence that you are a constructive administrator." App. at 1077. Abramson sent copies to Speert and Provost Smith.

On May 6, 1993, at a Technology Committee meeting, Seminoff suggested holding a technology conference on a Saturday. Abramson explained that she could not participate due to the Sabbath. According to Abramson, Seminoff screamed at her, saying that if Abramson would not run a conference for her on Friday night and Saturday, nothing Abramson did would have any value. App. at 137-38, 157. And during the 1993-94 academic year, Wepner suggested that faculty meetings be moved from Tuesdays, the day when they had been held for many years, to Friday afternoons, which would conflict with Abramson's observance of the Sabbath. App. at 163-64.

Final Review for Retention

On September 20, 1993, five out of seven members of the Committee voted to recommend Abramson's retention for a fifth year, and for her early tenure. The Committee's report stated the following:

> Dr. Abramson is a skilled teacher and instructional designer in the interactive classroom setting. . . . Students also recognize Dr. Abramson's excellence as a teacher/educator. . . . She encourages students to listen, think, and communicate and to develop their intellectual skills. . . . Dr. Abramson's working relationships with faculty are flavored with respect. She is genuinely considerate and thoughtful of others and is willing to assist in any way possible. . . .[She] does her share to further educational and professional meetings. . . . She is a well rounded professional .. . who represents the college admirably . . . . On campus, Dr. Abramson has distinguished herself in a variety of roles. . . . Not only is she a fine scholar, but she is a valued colleague as well.

8

App. at 234-38. The Committee also noted that Abramson had an outstanding publication and speaking record, and served on many university committees. It stated that she had "restructured and expanded the graduate concentration in technology education . . . ." App. at 239. It also discussed the future goals of the institution with respect to her field of expertise, finding that she was in a position to help WPC attain those goals. It stressed Abramson's networking abilities and her status as a "nationally recognized leader in her field," calling her "a valuable resource and an asset to the College." Id.

The two other voting members of the committee, Aitken and Coletta, were not present at the meeting. Wepner was also absent. On September 23, 1993, Aitken, Coletta and Wepner appended comments to the Committee's recommendation. Aitken wrote that she had "reservations regarding the [C]ommittee's recommendation," while Coletta and Wepner noted that they did "not agree with the Committee's recommendation." App. at 974.

Seminoff then wrote a memorandum to the Provost, stating that she did not recommend Abramson's retention. She cited concerns with three of the four applicable criteria for retention and tenure -- teaching, research/scholarly activity and service. App. at 975. Speert then undertook an analysis of Abramson's retention folder.

On September 22, 1993, Abramson wrote a letter to Robie Cagnina, WPC's Affirmative Action Officer, stating in part: "This is the . . . third [year] in which religious discrimination has been directed at me. I am being subjected to bias, discriminatory treatment, harrassment [sic], and outright hatred because I live as an Orthodox Jew." App. at 311. At the bottom of the letter, Cagnina wrote the following: "September 22, 1993 Met with Dr. Abramson regarding this issue; discussed options for the filing of a complaint. Choice was to file with the Division of Civil Rights. RSC" Id.

On October 13, 1993, Wepner complained to Abramson, during a lengthy attack on her professional contribution during a graduate curriculum meeting: "[T]he trouble with you is that it doesn't show that you are Orthodox." App. at

9

138. During the following week, Abramson sent a letter to Speert, asking that, in light of Seminoff 's negative recommendation, he read her retention materials carefully. She wrote: "It appears that [Seminoff 's] bias against me as an Orthodox Jew overwhelms her professional judgment." App. at 377. On October 25, 1993, nearly two weeks later, Speert wrote Abramson a letter informing her that he did not intend to recommend her reappointment. App. at 977. He later expressed the reasons for his decision in a memorandum, sent to her on November 12, 1993. It appears clear from the memorandum that his reasons differed from Seminoff 's. In Speert's opinion, Abramson's "potential contribution to her Department, Program and the College . . . [did] not justify reappointment." App. at 979.

Abramson then went through an appeals process, but Speert reached the same conclusion once again. In his deposition, he explained his reasons for not retaining Abramson. Speert said that the main reason was that the retention folder presented to him contained evidence of her inability to take leadership and guidance. App. at 1098. He clarified that the referred-to evidence involved issues related both to grants and to the accreditation visit by the National Council on the Accreditation of Teachers of Education ("NCATE").3 He also noted that Abramson had failed to create a concentration in technology and refused to work with administrators to create an Apple computer lab.

_____

3. Speert testified in his deposition that Abramson dealt with a grant for Merck and a program with the Stevens Institute of Technology in a way that was "not consonant with college processes." App. at 1102. He stated that "her view with respect to the [Merck] grant was limiting and did not take into account either circumstances at the school level or college level or any level." App. at 1101. With respect to a proposed program with Stevens, he said that "Dr. Abramson's response to the issue was centered about individuals and not centered about the program, the program gains with respect to the college and the college's cost benefit analysis with respect to that program." App. at 1107. Regarding the NCATE accreditation, Speert testified that he was referring to Abramson's complaints about not being placed on the steering committee, and her refusal to participate in the preparation for the accreditation visit after being excluded from the steering committee. App. at 1107-09.

10

Other Evidence Offered

Abramson also offered affidavits from several WPC faculty members. The affidavit of Linda Dye, WPC professor and president of the faculty union from 1993-94, supported many of Abramson's allegations. She stated that Speert had refused to say at Abramson's appeal meeting why she was terminated, App. at 159, and also that the reasons given by WPC could all be refuted, App. at 160-61. She declared the following:

> All but three or four faculty members in the School of Education had difficulties with Dean Seminoff. Even within that context, Dean Seminoff 's conduct toward Professor Abramson stood out for its personal hostility. In contrast to her treatment of other faculty members, Dean Seminoff required Professor Abramson to justify every one of her actions in each and every area of Professor Abramson's work . . . . Dean Seminoff 's criticisms of Professor Abramson's performance were without basis . . . . Especially notable was her insistence that Professor Abramson be excluded from the committee preparing the School of Education for an accreditation visit by a team from [NCATE], since Professor Abramson had special expertise as she was a member of NCATE . . . . Seminoff 's unfair criticism of Professor Abramson's performance and her hostile conduct toward Professor Abramson were motivated by her disapproval of Professor Abramson's strict adherence to Jewish religious laws . . . .

App. at 156-57.

The affidavit of Stanley Wollock, a tenured professor in Abramson's department, noted that Friday afternoon meetings were changed because "Wepner was aware that Professor Abramson was unable to attend . . . because of her observance of the Jewish Sabbath." App. at 163. He also recounted that Wepner had stated that Abramson "would not be fulfilling her duties" if she did not attend the faculty meetings. App. at 164. In addition, he noted that Dean Seminoff said "you people" to Abramson more than once and treated her "much more harshly than she treated other faculty members." Id. According to his observations,

11

he believed the Dean's dislike of Abramson was based on her religion. App. at 165.

Doris White, a tenured professor in Abramson's department who was a member of the Retention and Tenure Committee in the Fall of 1993, stated, "Dean Seminoff was prejudiced against Jews," assigning both Abramson and another untenured Jewish faculty member to work on many Friday nights, though White was never asked to teach on a Friday night. App. at 168. She also declared that faculty meetings were only scheduled on Fridays while Abramson was in the C&I Department. Id. Additionally, White stated that Abramson had more technological expertise and had published more than the rest of the faculty in the C&I Department. App. at 167.

Finally, Abramson submitted the declaration of her former colleague, Cordelia Towney. Abramson and Towney had both been on the faculty at a different college earlier in their careers, and had worked on a book together while Abramson worked at WPC. WPC had also employed Towney for one semester. Towney stated that "[t]he religious harassment which [Abramson] suffered at WPC made her feel like a beaten puppy. She became sallow, stooped, [and] she looked broken." App. at 174.

In addition to these declarations and her own affidavit, Abramson submitted a Post-It note written by Wepner that was contained in Abramson's file. App. at 445. The note said, "If you are dealing with grad program teachers – work all day –- Logical for any working class college to have conferences on Sat[urday] – needs of institution conflict with her practicing religion –- go. Conferences on Saturday to deal." Id. Abramson also introduced into evidence extremely positive student evaluations she had received during the 1992-93 academic year, faculty evaluation forms completed between April 1992 and May 1993 praising her work,4 as well as ten letters written to Speert by students and faculty members who strongly supported her retention. App. at 183-85, 347-62, 380-93.

_____

4. One peer review was much more critical of Abramson than the others; this was written by Wepner.

12

B. Procedural History

On November 3, 1993, Abramson filed a complaint of employment discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the New Jersey Division on Civil Rights ("NJDCR"). App. at 141. After filing a grievance with her union that was eventually denied, Abramson filed a complaint of religious discrimination and retaliation with the NJDCR and the EEOC on September 2, 1994. After receiving a right to sue letter from the EEOC, Abramson commenced this action in the United States District Court for the District of New Jersey on August 17, 1995.

The District Court delivered its summary judgment ruling from the bench on December 10, 1999, disposing of the issues raised in a lengthy oral opinion that was interspersed with dialogue between the Court and counsel. The Court entered its order on December 14, 1999, granting summary judgment in favor of WPC on all claims. In its oral opinion, the District Court briefly considered Abramson's hostile work environment claim, rejecting it because it found that Abramson did not present evidence that would satisfy the prima facie case. The Court focused primarily on Abramson's failure to make out the first element of the prima facie case: intentional discrimination on the basis of religion. In its view, there were too many other explanations for Wepner's conduct, making the religious animus explanation unreasonable. Dist. Ct. Op. at 78–79. Furthermore, it stated that the "same evidence works for both" discrimination and hostile work environment claims, and indicated it was considering Abramson's inability to prove pretext in its analysis of her hostile work environment claim. Id. at 77–78. Overall, it found that "at best, [Abramson] raises a scintilla of evidence." Id. at 83.

The vast majority of the District Court opinion addressed Abramson's religious discrimination claim. The District Court was unpersuaded by the evidence relied on by Abramson to support her claim, though it did not refer at all to the declarations submitted by Abramson's fellow professors. It stated that because the Committee voted to grant Abramson tenure, the focus of the inquiry should be

13

on whether President Speert failed to make a tenure decision because of discriminatory animus. It found that there was no evidence of such animus. Id. at 81–82. The Court held that "at best [Abramson] raises a scintilla of evidence in the overall inquiry, by virtue of what the record reveals concerning the mind of Shelly Wepner." Id. at 83. In addition, the Court found that Abramson had failed to establish that WPC's reasons for terminating her were pretextual. Id.

The District Court dismissed the comments made about Abramson's religion as "stray remarks." Id. at 30. The Court opined that there was a lack of evidence that people acted negatively toward Abramson because of her religious absences. Id. at 58–59. The Court expressed its belief that Wepner was "hotheaded" and that her bad treatment of Abramson was unrelated to religion. Id. at 59–60, 78.

The District Court then examined Wepner's statement to Abramson ("The trouble with you is that it doesn't show that you are Orthodox.") at length, acknowledging that it sounded "angry" and "confrontative"[sic]. Id. at 52. However, after reading Wepner's deposition, the Court "gleaned from that a position that [Wepner] as a Jew has, which is that she felt that her own religious practices were down-played [sic] and low-keyed by her, as a matter of her dealing with the issue of possible Antisemitism . . . ." Id. at 53. The District Court asked whether or not Wepner's remark, "standing alone . . . establishes a religious bias," and found that "[t]here's just no way I find for someone to hear Shelly Wepner's remark and draw any kind of an inference that that per se remark is evidence of discriminatory animus towards Abramson . . . ." Id. at 53–55. Instead, it determined that it only showed a"clear difference of opinion with respect to Abramson's open acknowledgment and requests for acknowledgment of her Orthodoxy . . . ." Id. at 55.

The District Court then addressed Wepner's Post-It as a "stand-alone document to give us a vision of Shelly Wepner's mind-set [sic] with respect to Abramson." Id. The Court was persuaded that the note "establishes even more strongly that Wepner moved from a difference of opinion with plaintiff regarding the practice of her religion and

14

broadened that in her mind to a conclusion that . . . Abramson was not . . . going to meet the needs of the institution." Id. at 56. However, the Court found that Abramson had failed to show the requisite nexus between Wepner's Post-It and WPC's decision not to retain her because it was "not contextually established where, when and how this Post-[I]t played a role in anything other than Wepner's own dossier regarding the plaintiff." Id. Although the Court noted that it was possible that Wepner somehow influenced Speert, it found that a possibility was insufficient: "there has to be proof of a determinative factor, i.e. factor of discrimination. Not the possibility." Id. at 57.

The District Court was similarly unconvinced that Abramson's absence from Friday faculty meetings affected her job performance, and it also rejected the argument that the rescheduling of faculty meetings was done in an effort to harass Abramson or to discriminate against her. Furthermore, the Court did not believe that Seminoff 's request that Abramson account for her absences was related to religion. It ascribed her being charged with a sick day on a Jewish holiday when she was not scheduled to teach, and the six-month delay in correcting it, to "administrative and bureaucratic bumbling." Id. at 69. The Court stated that it was considering the record as a whole, and in doing so, it found that Abramson did not disprove the legitimate nondiscriminatory reason WPC gave for not retaining Abramson. Id. at 83.

In rejecting Abramson's retaliation claim, the District Court held Abramson did not give "a clear enough indication that she was raising religious discrimination as an issue." Id. at 76. The Court considered only Speert's alleged change in demeanor when evaluating the adverse employment action prong of the retaliatory inquiry, and held that "whatever Speert did or didn't do with respect to friendliness would call for rank speculation on the part of the jury, if that jury was asked to say or to find that there was retaliation." Id. The District Court did not consider Abramson's ultimate termination as an adverse employment action.

Abramson appeals, arguing that the District Court erred in dismissing her Title VII and NJLAD religious

15

discrimination, hostile work environment, and retaliation claims. She argues that she established a prima facie case for each of her claims. First, she argues that she has recounted sufficient proof of all elements of the prima facie case required for a hostile work environment claim. With respect to her religious discrimination claim, Abramson stresses that she submitted ample evidence that her supervisors were motivated by discriminatory animus stemming from her insistence that she be allowed to practice her Orthodox Jewish beliefs. She also argues that she presented credible evidence that WPC's reasons for terminating her were pretextual. With regard to her retaliation claim, Abramson contends that the record clearly reflects that she made her supervisors aware that she was complaining of discrimination, and that her termination was motivated by those complaints. We will consider each of Abramson's claims in the order raised by appellant, beginning with her hostile work environment claim.

II.

The District Court had subject matter jurisdiction under 28 U.S.C. S 1331 and 28 U.S.C. S 1343, and supplemental jurisdiction under 28 U.S.C. S 1367. We have appellate jurisdiction over this appeal pursuant to 28 U.S.C.S 1291. We exercise plenary review over the District Court's grant of summary judgment to WPC, and we apply the same standard that the District Court should have applied. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000). A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the evidence, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Farrell, 206 F.3d at 278. While the individual pieces of evidence alone may not suffice to make out the claims asserted, we must view the record as a whole picture. Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir.

16

1997). As we stated in Andrews v. City of Philadelphia, 895
F.2d 1469, 1484 (3d Cir. 1990), "A play cannot be
understood on the basis of some of its scenes but only on
its entire performance, and similarly, a discrimination
analysis must concentrate not on individual incidents, but
on the overall scenario."

A. Hostile Work Environment

Abramson's first claim is that she was subjected to a
hostile work environment based on her religion. To make
out a prima facie case for a religiously hostile work
environment5 under Title VII, a plaintiff must demonstrate
five elements: "(1) the employee[ ] suffered intentional
discrimination because of [religion]; (2) the discrimination
was pervasive and regular;6 (3) the discrimination

_____

5. We have yet to address a hostile work environment claim based on
religion. However, Title VII has been construed under our case law to
support claims of a hostile work environment with respect to other
categories (i.e., sex, race, national origin). We see no reason to treat
Abramson's hostile work environment claim any differently, given Title
VII's language. See 42 U.S.C. S 2000e-2(a)(1) (prohibiting employers from
discriminating against an individual because of"race, color, religion,
sex,
or national origin."). Therefore, we apply the well-established framework
for hostile work environment claims with respect to other protected
categories to our analysis of a hostile work environment claim made on
account of religion. We also note that there is at least one reported
decision from a court of appeals that has held that a claim for a hostile
work environment based on religion exists, and applied the same prima
facie case we use here. See Hafford v. Seidner , 183 F.3d 506, 514 (6th
Cir. 1999) (holding that plaintiff "did not demonstrate a triable issue
over
whether he was subjected to a hostile work environment based on
religion.").

We also note that a New Jersey court has also recognized that hostile
work environment claims based on religion are cognizable under the
NJLAD. See Heitzman v. Monmouth County, 728 A.2d 297, 303 (N.J.
Super. Ct. App. Div. 1999) (discussing plaintiff 's claim that he was
subjected to hostile work environment because he was Jewish and
noting that New Jersey courts have relied upon federal court decisions
construing Title VII hostile work environment claims when reviewing
such claims under NJLAD).

6. We note, as we did in Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 106
n.2 (3d Cir. 1994), and Spain v. Gallegos, 26 F.3d 439, 449 n.14 (3d Cir.

17

detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [religion] in that position; and (5) the existence of respondeat superior liability." Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999) (citing Andrews, 895 F.2d at 1482).

Under the NJLAD, a plaintiff states a claim for a religiously hostile work environment by showing that the "complained-of conduct (1) would not have occurred but for the employee's [religion]; and it was (2) severe or pervasive enough to make a (3) reasonable [Orthodox Jew] believe that (4) the conditions of employment were altered and the working environment was hostile or abusive." Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 114 (3d Cir. 1999), cert. denied, 528 U.S. 1074 (2000) (quoting Lehmann v. Toys R Us, Inc., 626 A.2d 445, 453 (N.J. 1993)). 7

_____

1994), that the Andrews formulation of this prong differs from the Supreme Court's. In Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), and most recently in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998), the Supreme Court articulated the standard for hostile work environment claims. It required that the plaintiff demonstrate that the harassment was "severe or pervasive." Id. On at least one previous occasion, we have also referred to the standard as severe or pervasive. See Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667 (3d Cir. 1999) (applying Title VII hostile work environment test to ADA harassment claim and holding that plaintiff failed to "demonstrate[ ] that the asserted harassment was pervasive or severe enough to meet the Harris standard."). In the instant case, Abramson asserts a claim that the discrimination was "pervasive and regular," thus fulfilling both the Andrews and the Harris tests. Therefore, we adopt the approach taken in Bouton. We note that the distinction between "severe or pervasive" and "pervasive and regular" may be important, but "do not find it necessary to resolve whether [the difference in language] was inadvertent." Bouton, 29 F.3d at 106 n.2.

7. New Jersey courts have placed a less onerous burden on the plaintiff by omitting the final prong of the analysis. Therefore, any plaintiff who has fulfilled the Title VII prima facie case will have also shown the elements required by the NJLAD. Because we find that Abramson has fulfilled the Title VII prima facie case, we will not discuss the NJLAD specifically, but note here that Abramson's claims under the NJLAD are intact based on her showing under Title VII.

18

The District Court rejected Abramson's religiously hostile work environment claims under both statutes, finding that the conduct alleged did not meet the requirements of the prima facie case. Dist. Ct. Op. at 78. Though it referred to all of the first four prongs of the test, the Court seemed to base its holding almost exclusively on Abramson's failure to meet the first prong, viewing that prong as involving the perception of a "reasonable person of the protected status" and requiring a discriminatory "animus." We disagree with this approach.

The proper inquiry at this stage was whether a reasonable factfinder could view the evidence as showing that Abramson's treatment was attributable to her religious faith and practice. Further, by asking whether a reasonable person would "necessarily construe" the conduct in question as being improperly motivated, the District Court appears to have viewed the evidence in the light most favorable to the party making, not the party opposing, the summary judgment motion. See Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000) ("It is not the province of the court itself to decide what inferences should be drawn.").

By requiring that Wepner's conduct be "linked" to a "discriminatory animus," Dist. Ct. Op. at 79, and stating that the record did not sufficiently "reveal[ ] [what was in the] mind of Shelley Wepner," id. at 83, the District Court seemingly required Abramson to introduce direct evidence of Wepner's intentional discrimination against her based on her religious beliefs. However, Supreme Court precedent does not support the need for a plaintiff to demonstrate direct evidence of her harasser's motivation for discrimination against her. In Oncale, the Court discussed a hostile work environment claim on the basis of sex, and stated the following:

> A trier of fact might reasonably find [sex] discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. A same-sex harassment plaintiff may also . . . offer direct comparative evidence about how

19

the alleged harasser treated members of both sexes in a mixed-sex workplace.

523 U.S. at 80-81. Similarly, we have never required a plaintiff to demonstrate direct proof that her harasser's intent was to create a discriminatory environment. Instead, we have held that, with respect to certain conduct, the intent to discriminate can be inferred. Andrews , 895 F.2d at 1482 n.3 (referring to sexual misconduct). We have also noted that because discrimination is "often simply masked in more subtle forms," it is often difficult to discern discriminatory animus. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996); see also Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999) ("The Supreme Court has recognized that an employer who discriminates will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent."). Thus, we have held that even the use of "code words" such as "all of you" and "one of them" could be sufficient evidence from which a jury could find an intent to discriminate. See Aman, 85 F.3d at 1083 ("The words themselves are only relevant for what they reveal -- the intent of the speaker."); see also Howley , 217 F.3d at 145, 148, 154-55 (finding hostile work environment claim on basis of sex viable where conduct at issue, though lacking any sexual component or reference to plaintiff 's sex, could, in context, reasonably be interpreted as having been directed at plaintiff because of sex).

The first prong of the Andrews test was not designed to protect harassers who fail to recognize the hostile or abusive nature of their comments and actions. Our case law does not indicate that the first prong requires a factfinder to peer inside the harasser's mind. Rather, it merely requires a showing that the offender's behavior was, as required by both Title VII and the LAD, based on a protected category. See Spain v. Gallegos, 26 F.3d 439, 447-48 (3d Cir. 1994) (noting that though facts before us did not include evidence of "blatantly sexist behavior," plaintiff made out the first element "by showing that gender was a substantial factor in the discrimination" and that plaintiff would not have been treated in the same manner if she were male) (internal quotation marks and citation

20

omitted); Drinkwater, 904 F.2d at 862 ("[E]vidence of a sufficiently oppressive environment could, in theory, give courts enough evidence to infer that the intentional discrimination prong of the Andrews test can be met even absent evidence of the harasser's subjective intent to discriminate.")

Regardless of what a harasser's intention is, if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted), and the conduct is based on one of the categories protected under Title VII, a hostile work environment claim will survive summary judgment. Here, almost all of the incidents alleged centered around Abramson's insistence that she not work during the Sabbath. Therefore, we hold that where, as here, the evidence tends to show that the harasser's conduct was intentionally directed toward the plaintiff because of her religion, the first prong of the prima facie case is met.

Turning to the remaining elements of the prima facie case for hostile work environment, we find that the evidence Abramson presented was sufficient to satisfy her burden on the other prongs as well. We conclude that the many incidents recounted by Abramson, coupled with the declarations of other WPC professors, are relevant and probative as to prongs two through four of the prima facie case for hostile work environment claims.8  Though we will

_____

8. We note that the parties disagree as to the District Court's treatment of the declarations, and we found the record quite vague in this regard. The District Court clearly did not allude to them in its oral opinion, but did make a general statement during oral argument on the summary judgment motion, offering the view that "some of the affidavits . . . would
be truly inadmissible." Tr. of Oral Arg. at 100. It then stated that "we might have [an] [in] limine battle about that . . . when we are dealing with whether or not it is admissible." Id.  at 101. Because we have not been referred to a motion contesting their admissibility or an order

21

address each prong individually, first, we briefly note the evidence that the District Court should have considered when ruling on Abramson's hostile work environment claim:9 (1) Seminoff 's "unprecedented" monitoring of Abramson's conferences and absences; (2) WPC charging Abramson with a sick day on a Jewish holiday when she was not scheduled to teach; (3) both Wepner and Seminoff, on separate occasions, criticizing and raising their voices at Abramson regarding her lack of availability during the Sabbath; (4) Wepner scheduling meetings on Jewish holidays and refusing to change them so Abramson could attend; (5) Wepner's pointed statement to Abramson regarding her faith and behavior ("The trouble with you is that it doesn't show that you are Orthodox.").

First, a jury could find that the harassment was pervasive. The events alleged occurred over a period of two years and could be found to have infected Abramson's work experience; even other faculty members mentioned it to Speert prior to Abramson's filing suit. App. at 390-91, 513, 540-41. No one event alone stands out from the rest, but all of the events could be found to aggregate to create an environment hostile to a person of Abramson's religion. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999) ("[I]t is settled law that courts should not consider each incident of harassment in isolation. Rather, a court must evaluate the sum total of abuse over time.") (internal citation omitted). Taken as a whole, all the events alleged indicate that the harassment rose to the level of pervasiveness required to withstand summary judgment.

_____

ruling them inadmissible, we assume for our purposes that they are to be considered. However, we note that their admissibility is a matter for the District Court to decide. See United States Sec. and Exchange Comm'n v. Infinity Group Co., 212 F.3d 180, 198 (3d Cir. 2000) (reviewing the exclusion of lay opinion testimony under Rule 701 for abuse of discretion); United States v. Eufrasio , 935 F.2d 553, 571 (3d Cir. 1991) (stating that admission under Rule 403 is reviewed under an abuse of discretion standard).

9. This list is not exhaustive. There are additional examples in the record.

A jury could also reasonably conclude that Abramson was detrimentally affected by the environment, thereby fulfilling the third prong. Abramson's declarations amply support such a finding, as do the three affidavits of her fellow WPC faculty members. In addition, the declaration of Cordelia Towney stated that "[t]he religious harassment which [Abramson] suffered at WPC made her feel like a beaten puppy. She became sallow, stooped, [and] she looked broken." App. at 174.

In determining whether the fourth prong, the objective test, is met,[10] we must "look[ ] at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The Supreme Court has stated that Title VII is not violated by the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe or pervasive as to constitute an objective change in the conditions of employment. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (internal quotation marks and citations omitted). The conduct in the instant case could be said to go beyond "simple teasing, offhand comments, and [non-serious] isolated incidents," which the Supreme Court has cautioned would "not amount to discriminatory changes in the terms and conditions of employment." Id. at 788 (internal quotation marks and citations omitted). We find that Abramson has made a sufficient showing, based upon the facts set forth above, that a jury could find that a reasonable person of her religion would find the conduct alleged to be so harmful that it altered her working conditions.

With respect to the fifth prong of the hostile work environment claim, the existence of respondeat superior

_____

10. We also note that the District Court analyzed whether a reasonable Orthodox Jew would find the behavior to be religiously motivated, but in assessing whether the fourth prong of the prima facie case is met, a court must consider whether or not a person in the protected category would be detrimentally affected by the conduct at issue.

23

liability, a jury could also find that this prong has been met. The Supreme Court crafted the standard for employer liability in Faragher, referred to as the "aided by the agency relation test":

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively) higher authority over the employee. When no tangible employment action is taken, a defending employee may raise an affirmative defense to liability or damages . . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge . . . .

524 U.S. at 807. Here, it is undisputed that Abramson was terminated. Hence, WPC cannot assert an affirmative defense, and the evidence of liability is clear. Because Abramson presented evidence sufficient to meet all five elements of the prima case, we reverse the District Court's grant of summary judgment on Abramson's hostile work environment claim.[11]

B. Religious Discrimination Claim

Abramson claims that she was terminated because her supervisors were motivated by discriminatory animus stemming from her insistence that she be allowed to observe her religious holy days. She alleges that WPC's

_____

11. We also note that the Court erred by conflating two of Abramson's legal claims, stating that the exact same evidence applied to both Abramson's religious discrimination claim and her hostile work environment claim: "[I]f I do not find that .. . the reason advanced were [sic] pretextual plaintiff has a difficult time establishing hostile work environment . . . the same evidence works for both." Dist. Ct. Op. at 77. The two claims have entirely different prima facie cases and often courts may consider evidence for one claim and not the other. For example, here, even if WPC could demonstrate that it had a legitimate, nondiscriminatory reason to terminate Abramson, she would still have a hostile work environment claim if she could establish the five prongs of the Andrews test, none of which are precluded by a failure to establish disparate treatment.

24

various, allegedly non-discriminatory reasons for terminating her employment were false and pretextual.

Title VII explicitly protects employees from adverse employment actions on the basis of religion: "(a) It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. S 2000e-2(a). As recognized by our sister circuits, though never explicitly recognized in our own jurisprudence, employees may assert two theories of religious discrimination:12 "disparate treatment," as alleged here, and "failure to accommodate." E.g. , Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1017 (4th Cir. 1996); Mann v. Frank, 7 F.3d 1365, 1368-70 (8th Cir. 1993). Because the cases in our court dealing with religious discrimination have routinely been of the "failure to accommodate" variety, we utilize a prima facie case here that differs from the one employed in our other religious discrimination cases. See, e.g., Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 224 (3d Cir. 2000).

To prove a claim under the "disparate treatment" theory, the prima facie case and evidentiary burdens of an employee alleging religious discrimination mirror those of an employee alleging race or sex discrimination. Chalmers, 101 F.3d at 1017. Accordingly, we apply the familiar

_____

12. The reason for the two different types of claims is that although Title
VII lists religion in the same list of protected categories as race and sex,
the definition of "religion" in 42 U.S.C. 2000e(j) creates the "failure to accommodate" theory by including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." The prima facie case, considered as part of the same framework known as the McDonnell Douglas  test, consists of three elements: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement." Protos v. Volkswagen of America, Inc., 797 F.2d 129, 133 (3d Cir. 1986).

25

burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805 (1973). The plaintiff must demonstrate that she (1) is a member of a protected class, (2) was qualified and rejected for the position she sought, and (3) nonmembers of the protected class were treated more favorably. Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-319 (3d Cir. 2000) (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992)). After the plaintiff establishes a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment decision. Once the employer does so, the plaintiff must demonstrate that the proffered reason was pretextual. Goosby, 228 F.3d at 319; see also Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 143 (2000).

Abramson also asserts a claim of religious discrimination under the NJLAD. In cases alleging disparate treatment, New Jersey courts have adopted a three-step test that mirrors the Title VII inquiry:

> (1) the complainant must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the employer must then show a legitimate non-discriminatory reason for its decision; and (3) the complainant must be given the opportunity to show that the employer's stated reason was merely a pretext or discriminatory in its application.

Chou v. Rutgers, the State Univ., 662 A.2d 986, 993 (N.J. Super. Ct. App. Div. 1995) (citing Dixon v. Rutgers, the State Univ. of N.J., 541 A.2d 1046, 1051 (N.J. 1988)). 13

Here, the District Court assumed, and the parties did not dispute on appeal, that Abramson met all three requirements of the prima facie case: (1) religion is a protected category under Title VII and Abramson is an Orthodox Jew, (2) she was qualified for the position; and (3) she was terminated while other non-Orthodox Jewish

_____

13. Under the NJLAD and Title VII, the analysis is essentially the same. Therefore, we will limit our discussion to Title VII. In doing so, we note that because Abramson's Title VII claim survives summary judgment, her NJLAD claim does as well.

professors were retained. The burden then shifted to WPC to proffer a legitimate, non-discriminatory reason for Abramson's termination. Goosby, 228 F.3d at 319. WPC offered many reasons for its decision. In fact, the reasons presented were ever-changing.

Seminoff wrote that after reviewing Abramson's retention file, she did not recommend Professor Abramson for retention due to concern "regarding the quality of accomplishment in [teaching, research, scholarly activity and service], with particular concern for the area of service." App. at 364. In Speert's memo to Abramson explaining his decision not to recommend her for reappointment, he wrote that her "overall record of contribution to the College and Community and potential contribution to the Department, Program and the College in terms of present and future programs do not justify reappointment." App. at 979. Later, in response to Abramson's discrimination complaint to the NJDCR, WPC claimed she was deficient in the following areas: scholarship and teaching, interpersonal skills during small group discussions, professional service on campus-wide and department committees/activities, and her scholarly record. App. at 404.

Finally, in Speert's deposition, he gave other reasons never previously mentioned, among them that Abramson failed to create a concentration in technology and refused to work with administrators to create an Apple computer lab. When pressed, Speert asserted that the main reason he did not retain Abramson was that the folder that had been presented to him contained evidence of her inability to take leadership and guidance. App. at 1098. Upon further inquiry, he said that this was based on Abramson's failure to follow proper procedures in securing grants, and her failure to be involved in the NCATE accreditation process. App. at 1099-110. Because WPC's burden at this stage is merely a burden of production, we agree with the District Court that WPC met its burden at this stage. See Ezold, 983 F.2d at 523 (referring to defendant's burden as burden of production).

The burden shifted to Abramson, who had to "point to some evidence, direct or circumstantial, from which a

27

factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

In Fuentes, we addressed just how much evidence of pretext a plaintiff needs to avert summary judgment. We held that "to avoid summary judgment, the plaintiff 's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id. (internal citations and emphasis omitted). Importantly, we qualified that statement with the following footnote:

> [The plaintiff need not] cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

Id., n.7. We then noted that it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus. Hence, to make a sufficient showing of pretext, Abramson must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in WPC's reasons that "a reasonable factfinder could rationally find them `unworthy of credence.' " Id. at 765 (citation omitted). And if Abramson can successfully demonstrate pretext, she need not present affirmative evidence of discrimination beyond her prima facie showing if a rational factfinder could conclude from the evidence of pretext that WPC's actions were discriminatory. Reeves, 530 U.S. at 147.

WPC's reasons can be grouped into two categories: (1) overall deficiencies in Abramson's scholarship, teaching and service -- the explanations given to the NJDCR, which are the same reasons Seminoff cited as the basis for not recommending retention; and (2) Abramson's failure to get along with supervisors and follow instructions, which were the main (though not exclusive) reasons Speert listed at his deposition.

Abramson refutes the first set of reasons by noting that Speert admitted in his deposition that these reasons were unfounded, saying that her folder gave evidence of "very good performance in both areas" of teaching and scholarship, App. at 468, and that her level of service "would not have raised a concern," App. at 498. In addition, WPC admitted at oral argument that these reasons were not the actual basis for Abramson's termination. This admission alone might suffice to satisfy Abramson's burden, but we need not decide based solely on that admission, because Abramson's evidence also refutes the second set of reasons given later by Speert.

With respect to Abramson's alleged failure to follow instructions insofar as she purportedly did not use proper protocols for proposed grants and programs, she argues that she was unaware of any protocols. App. at 147. She points to Speert's inability to identify at his deposition where the protocols were outlined in either the policy manual or the faculty handbook. App. at 478-79. Abramson presented testimony of the president of the faculty union stating there were not any protocols, App. at 160, and noted WPC's failure to include in the record any documents setting forth such protocols.

Abramson also attacked the legitimacy of WPC's reliance on the fact that she failed to accept leadership from Seminoff and Wepner as grounds for her termination. She argues that because these two women were her alleged harassers, and because her poor relationship with them was directly related to their hostility toward her religion, her difficulty working with them should not be credited as a legitimate, nondiscriminatory reason for her termination. She also submitted evidence of her positive contributions in teaching and scholarship (glowing teaching evaluations,

letters to Speert praising her, a fellow professor's declaration), including evidence that she was well-versed in the use of Apple computers and did in fact teach her students how to use them. App. at 132, 174. With respect to her alleged failure to develop the concentration in technology, Abramson points to the specific reference by the Committee to the contrary, presenting evidence that the Committee praised her work in this area. App. at 239. In addition, Abramson focuses on the timing of the reasons, stressing that two technology-related concerns were not mentioned until Speert's deposition.

Abramson also argues that the ever-changing nature of the proffered reasons can be considered as detracting from their legitimacy. We agree. If a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record. See Fuentes, 32 F.3d at 765 (listing "inconsistencies" and "contradictions" in employer's reasons among ways plaintiff could show pretext); see also Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986) (noting that district court could "appropriately" have taken employer's inconsistent explanations for termination into account in finding causation necessary to satisfy prima facie case of retaliatory discharge).

We find that based on the record as a whole, Abramson has successfully "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that "a factfinder could reasonably . . . disbelieve the employer's articulated legitimate reasons." Fuentes, 32 F.3d at 765. And as the Supreme Court recently stated in Reeves, this alone could support the inference that WPC's motivation was discriminatory:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's

30

> dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff 's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

530 U.S. at 147–48 (internal citations omitted).

However, the factfinder does not need to rely on that evidence alone. Abramson has also presented evidence from which a reasonable factfinder could infer that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of [WPC]'s action." Fuentes, 32 F.3d at 764. The confrontations with Seminoff and Wepner, the very probative declarations of Abramson's fellow professors, the laudatory faculty evaluations and Committee report, and Wepner's Post-it note all provide strong evidence to support Abramson's claim.

We note that the District Court appears to have viewed the evidence as a factfinder,[14] which contributed to the ruling. In addition, the District Court seems to have viewed each piece of independently, rather than in its entirety.[15] "In

_____

14. For example, with respect to Abramson being charged for a sick day on a Jewish holiday when she was not scheduled to teach, and then having to complain for six months to have the error rectified, the District
Court "ascribe[d] that to administrative and bureaucratic bumbling." Dist. Ct. Op. at 69. And when discussing Seminoff 's review of Abramson's absences and attendance at conferences in July 1992, the District Court concluded that such conduct was not motivated by discriminatory animus, but rather, Seminoff 's "leadership and part of doing the right thing as a manager." Id. at 63.

15. For instance, with respect to the Court's finding as to Wepner's comment to Abramson that "The trouble with you is that it doesn't show that you are Orthodox," the Court noted: "We are talking about whether this standing alone, per se without any tortured reasoning one way or another establishes a religious bias." Dist. Ct. Op. at 52–53 (emphasis added); see also id. at 55 (stating with respect to Wepner's Post-It note: "[T]his is offered as a stand-alone document to give us a vision of Shelly Wepner's mind-set with respect to Abramson.").

31

determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury . . . would be entitled to view the evidence as a whole." Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000). Accordingly, viewing the evidence in the light most favorable to the plaintiff, as is required when a defendant moves for summary judgment, and viewing the record as a whole, we conclude that Abramson's proof is sufficient to require that this claim be permitted to proceed to trial.

We note, also, that while the District Court relied heavily on the fact that it found no evidence in the record demonstrating that Speert himself possessed discriminatory animus toward Abramson, a rational jury could find that Speert did not make his decision in a vacuum. A reasonable inference that could be drawn from the record is that Speert was influenced by both Seminoff and Wepner. In fact, Speert even stated in his deposition that before making his decision not to retain Abramson, he sought Seminoff 's counsel. App. at 487. Moreover, there is an additional piece of evidence not mentioned in the District Court opinion that supports our view of the record on this point. The record contains a memo sent on October 21, 1993, from Seminoff to Speert with a subject line that read: "Request for information – Professor Gertrude Abramson," thus supporting the conclusion that Speert had sought input on the decision to retain Abramson.16 App. at 378. Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate. See Abrams v. Lightolier Inc., 50 F.3d 1204, 1214 (3d Cir. 1995) (stating in ADEA case that if plaintiff 's supervisor participated in decision to terminate him, even though president of company formally terminated him, evidence of supervisor's age–related animus would be relevant in determining if discriminatory motive at play); see also Russell v. McKinney Hosp. Venture, 235 F.3d 219,

_____

16. In this memo, Seminoff explained certain aspects of Abramson's retention file, including why Seminoff believed the committee vote was split, and a recitation of what Wepner's concerns were. At the end of the memo, Seminoff addresses "the allegation of religious bias." App. at 379.

226 (5th Cir. 2000) ("If the employee can demonstrate that others had influence or leverage over the official decisionmaker . . . it is proper to impute their discriminatory attitudes to the formal decisionmaker."); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) (stating that "discriminatory comments . . . made by . . . those in a position to influence the decisionmaker" can be evidence of pretext); Griffin v. Washington Convention Ctr., 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence."). As we noted in Roebuck v. Drexel University, 852 F.2d 715, 727 (3d Cir. 1988),"it is plainly permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision." Clearly, Wepner and Seminoff played a role in the ultimate decision to terminate Abramson, and their involvement thus makes their conduct toward her relevant and probative of discriminatory animus.

Considering the record before us, we find ample evidence to support Abramson's religious discrimination claim.

C. Retaliation Claim

Abramson's third and final claim is for retaliation. To advance a prima facie case of retaliation under Title VII and the NJLAD, a plaintiff must show that: (1) the employee engaged in a protected employee activity;[17] (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. See, e.g., Farrell, 206 F.3d at 278; see also Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997) (describing the third requirement as a "causal connection"); Craig v.

_____

17. The actual language used by the New Jersey courts, with respect to the first prong, is that an employee must show that he or she engaged in protected activity known by the employer. Craig v. Suburban Cablevision, Inc., 660 A.2d 505, 508 (N.J. 1995) (emphasis added).

Suburban Cablevision, Inc., 660 A.2d 505, 508 (N.J. 1995). We conclude that there is ample evidence of all three elements in the record, and disagree with the District Court's determination that Abramson did not make out a prima facie case.

1) Abramson engaged in protected activity.

On Oct. 22, 1992, Abramson wrote a letter to Speert, stating:

> I have lived as an Orthodox Jew all my life . . . . The non-discrimination policy of William Paterson College precludes the need to defend either religious observances or pursuit of career goals. Nevertheless, . . . it has been necessary for me to justify my lifestyle. See, for example, the attached memo sent to Dean Seminoff in response to her request for an explanation of my "conferences/absences" when I submitted a pro-forma travel request for an August conference.

App. at 932. On October 12, 1993, Abramson once again wrote to Speert after Seminoff gave a negative recommendation to the Committee regarding her future employment with WPC. App. at 377. This letter complained that "Dean Seminoff 's bias against [Abramson] as an Orthodox Jew overwhelms her professional judgment." Id. In addition to making her complaints known to President Speert, Abramson also complained to WPC's Affirmative Action Officer, Robie Cagnina. On September 22, 1993, Abramson filed a written complaint of religious discrimination with Cagnina, stating: "I am being subjected to bias, discriminatory treatment, harrassment [sic], and outright hatred because I live as an Orthodox Jew." App. at 311.

The District Court determined that Abramson failed to make out the first element, holding that she "did not articulate clearly and in a formal manner a religious discrimination complaint . . . " and that her"[October]18

_____

18. The District Court actually stated "April 1992" letter, but given that no such letter exists in the record, and that during that same discussion it had previously referred to the October 1992 letter, we assume the District Court simply misspoke and intended to say October.

34

1992 letter [was not] a clear enough indication that she was raising religious discrimination as an issue. She was [adverting] to it, but she was not flat out saying it." Dist. Ct. Op. at 75-76. Though we think that the October 1992 letter was sufficiently clear to have alerted Speert that Abramson felt she was being discriminated against,19 we need not rely on that letter alone in order to find that Abramson fulfilled the first prong.20 This is because not only did Cagnina admit that she understood Abramson's September 22, 1993 letter to her to be an "informal" complaint of discrimination, App. at 770, Speert also acknowledged that the October 12, 1993 letter from Abramson to him complaining of "bias" toward her as an Orthodox Jew was quite clearly a complaint of discrimination, App. at 515.

Under our precedent, the letters Abramson wrote to Cagnina and Speert fall squarely within the requirements of the first prong of a retaliation claim. We have previously noted in the ADEA context that "we do not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite `protected conduct' . . . ." Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (citing Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (explaining that acceptable forms of protected activity under Title VII's analogous opposition clause include formal charges of discrimination "as well as informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal

_____

19. Speert's statements in his deposition regarding this letter are inconsistent. First, he notes that he called Wepner after receiving this letter and asked her "about the references to challenge on the basis of religion," which imply that he realized she was alleging unfair treatment due to her religion. App. at 504. Yet, Speert also says that he did not consider the letter to be a complaint of religious discrimination. App. at 507. However, Seminoff did acknowledge in her deposition that she was aware that Abramson felt she was the victim of discrimination during the 1991-92 academic year. App. at 604.

20. It is unclear from the District Court opinion why it did not consider any of Abramson's complaints besides the October 1992 letter.

charges")). Similarly, here, the complaints to WPC, whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case, provided the complaints expressed Abramson's opposition to a protected activity under Title VII. Thus, we hold that the record contains a sufficient showing that Abramson engaged in protected activity.

2) Abramson suffered adverse employment action.

With respect to the second element -- i.e., adverse employment action, the District Court only focused on Abramson's claim that Speert treated her differently after she voiced her complaints, rather than considering the more obvious adverse employment action of her termination. We hold that Abramson's termination clearly fulfills the second prong of the prima facie case for a retaliation claim. In addition, Seminoff 's recommendation not to retain Abramson would also qualify as an adverse employment action sufficient to meet this element.

3) A causal link exists between the protected activity and the adverse action.

Given that the District Court viewed Speert's change in demeanor as the only adverse action, it dismissed the issue of causation out of hand, stating that it "would call for rank speculation on the part of the jury" to ask it to find retaliation. Dist. Ct. Op. at 76. But because the two instances of adverse action we examine are Seminoff 's recommendation not to retain Abramson and Abramson's ultimate termination, the analysis changes significantly.

Based on our case law and the evidence adduced, Abramson has made a sufficient showing of the causal connection required by the third prong of the prima facie case of retaliation. In Farrell, we recognized that our case law has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism. 206 F.3d at 281; see also Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997) ("[T]emporal proximity . . . is sufficient to establish the causal link . . . . [A] plaintiff can [also] establish a link

36

between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period."). Here, it could be argued that the proximity in time between Abramson's last letter to Speert on October 12, 1993, and her being informed Speert would not recommend her for retention on October 25, 1993, is not conclusive because her discharge occurred in accordance with her annual review for retention. However, the timing factor is made more convincing by Cagnina's admission that she called Seminoff after meeting with Abramson in September 1993 and told her that Abramson had "apprised [her] that she believed she had been discriminated against." App. at 770. Seminoff wrote a very negative recommendation against Abramson soon after that phone call from Cagnina.

In any event, we need not rely on timing alone because Abramson has presented additional evidence to prove the causal nexus. First, she has demonstrated ongoing antagonism from her department head and the dean, as we noted in our discussion of the facts above. Further, she introduced other types of circumstantial evidence regarding WPC's proffered reasons for terminating her, which we have previously recognized as potentially probative of a causal connection. Farrell, 206 F.3d at 284 ("[A] plaintiff may rely upon a broad array of evidence to [illustrate a causal link]."). For instance, we have noted that a plaintiff may show that her employer gave inconsistent reasons for terminating her. See Waddell, 799 F.2d at 73 (stating that district court could "appropriately" have taken inconsistent explanations into account in finding causation necessary to satisfy prima facie case). Revealing discrepancies in the proffered reasons can also constitute evidence of the causal link. See Farrell, 206 F.3d at 285–86 (listing plaintiff 's attacks on validity of reasons given). Here, as we found in our discussion of the discrimination claim, Abramson has succeeded in both casting doubt on the reasons WPC proferred for her termination, and in demonstrating that those reasons were vague and inconsistent. In light of this evidence, coupled with the "ongoing antagonism" reflected in the record, including Speert's change in demeanor after Abramson complained of discrimination,21  we find that the

_____

21. The District Court did not find this allegation persuasive, instead crediting Speert's explanation that the reason he did not interact with

37

record contains ample proof of a causal connection.
Therefore, Abramson has presented sufficient evidence to
meet all three prongs of a prima facie retaliation claim so as
to withstand summary judgment, and we will reverse the
District Court's ruling on this claim.22

III. Conclusion

As we stated in Farrell,

> We recognize that different inferences might be drawn
> from the evidence presented in the record. On
> summary judgment, however, when viewing the
> sufficiency of the prima facie case, our role is not to act
> as fact finder. Instead, we must consider the evidence
> taken in the light most favorable to the non-movant
> and determine whether [the plaintiff] can show the
> causation required . . . .

206 F.3d at 286. Here, there is ample evidence from which
a reasonable jury could draw inferences establishing all
three of Abramson's claims. Accordingly, we will REVERSE
the District Court's order granting summary judgment in
favor of WPC on Abramson's claims of hostile work
environment, religious discrimination and retaliation, and
REMAND for further proceedings.

_____

Abramson was because it was his practice to avoid having any contact
with anyone being considered for tenure. App. at 115. In doing so, the
District Court failed to consider the evidence in the light most favorable
to Abramson.

22. Needless to say, our opinion should not be interpreted as expressing
any view as to whether Abramson was in fact subjected to religious
discrimination or retaliation. We hold only that these questions cannot
properly be decided at summary judgment and must be submitted to the
trier of fact.

38

ALITO, Circuit Judge, concurring.

I write separately to add a brief explanation of my understanding of the basis for holding that the summary judgment record is sufficient to permit the plaintiff 's religious harassment claim to go to trial. Harassment is actionable under Title VII and the New Jersey Law Against Discrimination only if it is so severe or pervasive that it alters the terms or conditions of the plaintiff 's employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998); Taylor v. Metzger, 706 A.2d 685, 688-89 (N.J. 1998). Offensive comments and actions that do not rise to this level are insufficient. Id. This is an exacting standard, and William Paterson College argues that the evidence in this case does not meet it. The College relies on Heitzman v. Monmouth County, 728 A.2d 297 (N.J. Super. Ct. App. Div. 1999), in which certain anti-Semitic remarks were held not to have altered the conditions of employment, and the College maintains that "Abramson has not demonstrated conduct beyond `the ordinary tribulations of the workplace' which is so extreme as to amount to a change in the terms and conditions of employment." Appellee's Br. at 40 (quoting Faragher, 524 U.S. at 788). The Court responds to the College's argument by saying that "[t]he conduct in the instant case could be said to go beyond `simple teasing, offhand comments, and [non-serious] isolated incidents.' " Maj. Op. at 23 (quoting Faragher, 524 U.S. at 788) (brackets in majority opinion) (internal quotation marks and citations omitted in majority opinion). I agree with the Court's statement, but I think that it is necessary to explain why the conduct alleged in this case "could be said to go beyond . . . ."

The reason is that a reasonable trier of fact could infer that officials of the College intentionally pressured the plaintiff to violate the dictates of her faith in order to keep her job. As the brief of an amicus curiae observes:

> When an employer deliberately reschedules important meetings for Friday afternoons, the message to an Orthodox Jewish employee is clear as a bell. Such rescheduling tells the employee that continued observance of his or her faith will be viewed as incompatible with adequate job performance. Repeated

39

requests that work be done on Saturdays or Jewish holidays -- or telephone messages left on a Jewish religious holiday demanding an `immediate' response -- are aimed directly at an employee's religious observance. Criticism of an employee's effort to reconcile his or her schedule with the observance of Jewish holidays delivers the message that the religious observer is not welcome at the place of employment. [1]

Intentionally pressuring a person to choose between faith and career is more "severe" and has a more direct effect on the conditions of employment than the sort of offensive remarks at issue in Heitzman. While case law provides only limited protection for employees whose religious obligations conflict with neutral job requirements, see Employment Div., Dep't of Human Resources of Oregon v. Smith , 494 U.S. 872 (1990); Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977), Title VII does not permit an employer to manipulate job requirements for the purpose of putting an employee to the "cruel choice" between religion and employment. Braunfeld v. Brown, 366 U.S. 599, 616 (1961) (Stewart, J., dissenting). It is for this reason, in my view, that the summary judgment record is sufficient to support the plaintiff 's religious harassment claim.

A True Copy:
Teste:

  Clerk of the United States Court of Appeals
  for the Third Circuit
_____

1. Brief for Amicus Curiae National Jewish Commission on Law and Public Affairs, at 4.