Julius WEBB, et al. Plaintiffs,

v.

MERCK & CO., INC., Defendant.

No. Civ.A. 99–413.

United States District Court,
E.D. Pennsylvania.

Sept. 8, 2006.

Adrian J. Moody, Joseph C. Kohn, Martin J. D'Urso, Law Offices of Adrian J. Moody, PC, Hilary E. Cohen, Hadley Perkins Roeltgen, Kohn Swift & Graf, P.C.,

Robert T. Vance, Jr., Law Offices of Robert T. Vance, Jr., Michael Cole Ksiazek, Frost & Zeff, Mark B. Frost, Philadelphia, PA, Isaac H. Green, Lansdale, PA, for Plaintiffs.

Judith E. Harris, Michael J. Ossip, Tamsin J. Newman, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

### Memorandum and Order

YOHN, District Judge.

Plaintiff Anthony Green brings this hostile work environment, retaliatory suspension, and discriminatory discharge case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Green, an African–American man, claims in his amended complaint that his former employer, defendant Merck & Company, Inc., subjected him to a hostile work environment because of his race, and when he attempted to obtain relief from this conduct, suspended him in retaliation. He also alleges he was later discriminatorily discharged based in part on that retaliatory suspension.

This action was originally filed as a class action on January 27, 1999, of which Green was a putative member. On September 21, 1999, the court denied plaintiffs' motion and supplemental motion for class certification. On September 12, 2000, plaintiffs filed an amended complaint, and on April 1, 2002, the court denied plaintiffs' second motion for class certification. On May 24, 2004, the parties entered into a stipulation, approved by the court on June 15, 2004, in which they agreed to try the individual claims of certain plaintiffs on a priority basis, including the claims of plaintiff Green. In that stipulation, the parties agreed that discovery would be conducted and evidence would be presented in Green's case only as to certain claims: that Green was subject to a hostile work environment as a result of his direct supervisor's comments and actions, that he was unfairly disciplined in retaliation for his complaints about his treatment, and later, that he was discriminatorily discharged.[1]

Presently before the court is Merck's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set forth below, I will grant Merck's motion for summary judgment with regard to Green's discriminatory discharge claim, but deny its motion with regard to the remaining claims.

### I. FACTUAL BACKGROUND[2]

### A. Plaintiff's Employment at Merck

In November 1988, Merck—a global pharmaceutical company that develops, manufactures, and markets vaccines and medications—hired Green. (Anthony Green Dep. Tr. 18:1–17.) Previously, plaintiff had made his living as a professional boxer. (Green Aff. ¶ 7.) He had no formal education beyond the tenth grade, and no prior experience working in the pharmaceutical industry. (Green Dep. Tr. 15:2–11; 25:13–17.) After approximately six years, plaintiff was promoted to the position of line operator. (*Id.* at 18:21–19:9.) In June of 1996, he was promoted to the position of Lyo Materials Coordinator ("LMC") in Department 285 of Merck Manufacturing Division ("MMD"). (*Id.* at 20:6–17.) Throughout his employment at Merck, Green was a member of a collective

---

1. The case was reassigned to the undersigned on November 16, 2005.

2. This factual account contains both undisputed facts and plaintiff's factual allegations, because this is a motion for summary judgment and I must view all facts and inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Brown v. Muhlenberg Township,* 269 F.3d 205, 208 (3d Cir.2001) (citing *Beers–Capitol v. Whetzel,* 256 F.3d 120, 130 n. 6 (3d Cir.2001)).

bargaining unit represented by the Oil, Chemical and Atomic Workers' International Union, Local 8–86.

During the period relevant to this action, plaintiff worked in Department 285 in Merck's West Point, Pennsylvania facility. Department 285 manufactures a variety of vaccines, including the MMR vaccine for measles, mumps, and rubella as well as the Varicella vaccine for chicken pox. (*Id.* at 21:7–24.) Department 285 employees assist with the packaging, loading, sterilization, and freezing of the vaccines. The vaccines are processed in a sterile environment known as the "core." (*Id.* at 28:6–11.) In a sterile gowning room adjacent to the sterile core, employees are required to dress themselves in sterile footwear, gloves, gown, bonnet, and masks prior to entering the core. (*Id.* at 28:14–29:4.) In addition, employees are required to sterilize their hands in order to minimize the risk of contaminating the vaccines. (*Id.*)

As an LMC, plaintiff was responsible for packaging vaccines into containers, loading vaccines into sterile cabinets, and sterilizing and freezing trays of vaccines. (*Id.* at 27:10–28:4.) He also received training in the thawing of pharmaceutical products, checking vials for defects, and working on the mustargen line, the production line, and the Straight Through Packaging ("STP") line. (O.A.C.W. Lyo Material Coordinator Job Description, Mot. for Summ. J. Ex. 1.)

Prior to fall of 1997, Green had a record of commendable performance at Merck, although he also worked another full-time, forty-hour per-week job as a roofer for the Philadelphia Housing Authority due to pressing family obligations. (Green Dep. Tr. 35:22–37:10; Arbitration Op. & Award, Mot. for Summ. J. Ex. G.) Plaintiff balanced these jobs by generally working the second shift at Merck, from 4 p.m. until 12 a.m., with Wednesdays and Thursdays off. (Green Dep. Tr. 30:8–31:2.) However, Green often worked overtime on the third shift, from 12:15 a.m. to 8:15 a.m., either consecutively from the second shift or on his scheduled days off. (*Id.* at 32:8–18, 38:6–9.) As a result, Green worked approximately 142 hours per week in total on a regular basis. (*Id.* at 35:7–37:20.) He seldom slept at home, and often took "cat naps" during his lunch breaks. (*Id.* at 37:24–38:13.)

### B. Alleged Discriminatory and Disparate Treatment

In the fall of 1997, James Murphy, a Senior Supervisor in Department 285, began to oversee the third shift on which Green frequently worked. The employees who directly reported to Murphy on the third shift were only the LMC's and the fillers, all of whom were African–American. (James Murphy Dep. Tr. 206:16–25; 212:22–213:1.) Prior to being assigned to supervise the third shift, Murphy had a checkered history at Merck, having been suspended, for example, in 1995 for submitting false overtime claims. (Keith Fryling Dep. Tr. 208:6–23.) Murphy was also known for making "inappropriate comments," and was criticized in his 1995 performance evaluation for inappropriately handling "sensitive labor relations issues." (*Id.* at 170:2–13; Murphy Dep. Tr. 64:3–24.) Despite these problems, Murphy testified in his deposition that he was called upon to administer more discipline than other Merck supervisors and was assigned the third shift because the opinion of Merck management was that the fillers and LMCs of Department 285's third shift were being given too much freedom by the supervisor (a young African–American woman) whom Murphy (a white male) was to succeed. (Murphy Dep. Tr. 103:9–104:23; 119:8–24; 212:22–213:1.)

After Murphy began as supervisor of the third shift, plaintiff alleges his work environment deteriorated and he began to receive frequent disciplines. Murphy al-

legedly treated plaintiff and other African–American employees with hostility, and attempted to intimidate them. (Green Dep. Tr. 39:1–40:21.) Soon after Murphy began working in Department 285, Green was given a written warning for being five to ten minutes late for work even though Murphy allegedly knew that plaintiff's employment as a roofer might sometimes lead him to be late.[3] (Id. at 40:5–24.) Green then complained to Murphy about his differential treatment of African–American workers. (Id.) Murphy denied it. (Id.) Plaintiff was then given a one-day suspension on September 16, 1997 for having incorrectly handled a Varicella vaccine that he had never been trained to process, as well as for several previous errors. (Id. at 49:1–9; Notice of Discipline, Mot. for Summ. J. Ex. C.) Furthermore, he was suspended for three days on October 16, 1997 for putting the chicken pox vaccine in the wrong freezer as well as for several other errors that were not addressed at the time they were committed. (Green Dep. Tr. 64:7–24; Notice of Discipline, Mot. for Summ. J. Ex. D.) Plaintiff alleges that these small errors were cobbled together to allow Murphy to discipline him more harshly.

Green alleges this treatment was disparate from the treatment of white employees. While Green was warned for being late to work, he alleges white workers received no discipline for returning late from their breaks.[4] (Id. at 126:6–10.)

When African–American workers did the same thing, Murphy would allegedly "jump all over them." (Id. at 41:13–16.) While plaintiff was disciplined for "minor errors," Joe Koloski, a white employee who worked as an LMC on the first shift, was allegedly applauded rather than disciplined for containing a chemical spill that he caused himself. (Id. at 42:11–23.) Likewise, Mike Castetta, a white employee who worked on the second shift, was not disciplined for leaving a box of MMR vaccine outside the cold vault. (Id. at 44:7–22.)

This environment allegedly caused great stress for Green, and he requested counseling through the Merck Employee Assistance and Behavioral Health Care Program ("EASE") in 1997. (Id. at 152:7–153:9.) He was then counseled by Linda Torres, M.S.W., regarding his anxiety and depression as a result of what he perceived as "the racist attitude and the hostile environment" created by Murphy. (Id. at 152:7–154:4.)

## C. Alleged Racial Epithets Used by Merck Supervisors

■ Then, in the fall of 1997, an African–African co-worker named Bruce Young told Green that he overhead Murphy refer to himself as "the new zookeeper" to another white employee in the break room.[5] (Id. at 88:23–89:21; Fryling Dep. Tr. 53:1–13; 73:2–23.) Young told Green that he heard the remark while sitting in the corner of the break room and that he

---

3. According to the Merck Employee Conduct Manual, the types of discipline normally given are: "verbal warning; written warning; 1–day suspension; 5–day suspension; and discharge." (Merck Employee Conduct Manual 2, Mot. for Summ. J. Ex. H.) However, the manual states that "discipline can deviate upward due to the seriousness of the violation or downward based on mitigating circumstances," as long as they are reviewed by Labor Relations and approved by the Director of the area involved. (Id. at 1.)

4. While Murphy's only direct reports were the LMCs and the fillers on the third shift (all African–American), the record appears to indicate that Murphy was the only supervisor in the whole Department who had responsibility for attendance discipline. (Murphy Dep. Tr. 206:16–25; 212:22–213:1; 104:19–21.)

5. To the extent that Green's testimony may include hearsay, this fact alone does not preclude the court from considering it. While evidence produced at the summary judgment stage must be "reduc[ible] to admissible evi-

did not believe that Murphy had seen him. (Green Dep. Tr. 88:23–89:21.) Young told Green that when Young asked Murphy what he meant by his remark, Murphy turned around and left the room. (*Id.* at 88:23–89:21.) While plaintiff was not in the break room and did not hear Murphy's remark firsthand, in his deposition Murphy admitted it "could be" that he called himself the "new zookeeper." (Green Dep. Tr. 88:23–89:21; Murphy Dep. Tr. 198:14–17.) Other employees also noted that Murphy had called himself the "new zookeeper" multiple times. (Henderson Interview Notes, Pl.'s Sur–Reply in Further Opp'n to Def.'s Mot. for Summ. J. Ex. 5.) A white employee, Leigh Harvilla, also reported to the Ombudsman, Dr. Moses Johnson (an African–American man), that Murphy began referring to the African–American third-shift employees as "animals." (Murphy Dep. Tr. 57:5–20; Leigh Harvilla Interview, Pl.'s Opposition to Motion for Summ. J. Ex. G.) Murphy admitted that Harvilla was an honest person and could not imagine any reason why she would have been untruthful to the Ombudsman. (Murphy Dep. Tr. 57:13–20.)

Green, who was upset about the "zookeeper" remarks, reported these remarks and the discriminatory treatment of African–American workers to Ombudsman Johnson, in the fall of 1997.[6] (Green Dep. Tr. 88:11–89:24.) Johnson, however, did not do anything about these comments because he was allegedly waiting for Young to call him back. (*Id.* at 90:17–23; Johnson Dep. Tr. 55:1–56:6.) Plaintiff alleges that everyone in the department knew he went to the Ombudsman's office, both because he was seen leaving the office and because he told others in the department he had gone to see the Ombudsman due to Murphy's comments. (Green.Dep. Tr. 90:24–91:11.) However, plaintiff never told Murphy himself that he went to the Ombudsman's office, nor does he know if anyone in the Department actually talked to Murphy about it. (*Id.* at 91:12–18.)

Plaintiff alleges that Murphy's conduct continued to go unabated because Murphy's supervisor, Keith Fryling, a white male who was the Associate Director of Lyo Operations, shared his racist views. (Pl.'s Answer to Def.'s Mot. for Summ. J. 6; Fryling Dep. Tr. 22:23–23–4.) According to plaintiff, Fryling's racist views were evident from his complaint that there were "too many niggers" in Department 285.[7]

dence" at trial, *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court has rejected the view that "the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Id.* at 324, 106 S.Ct. 2548. "Obviously, Rule 56 does not require the nonmoving party to depose [his] own witnesses." *Id.* Accordingly, "hearsay evidence produced in sworn testimony opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e. 'in a form that would be admissible at trial.' " *Williams v. West Chester,* 891 F.2d 458, 466 n. 12 (3d Cir.1989). Furthermore, the court notes that Merck moved for summary judgment despite plaintiff's request for additional depositions, on the ground that even if the potential deponents testify as plaintiff expects, Green's claims still fail as a matter of law.

6. The Ombudsman reports to the Chief Ethics Officer. The Ombudsman's responsibility is to "hear any work related issues or concerns of employees" and to "work[] with management to try to resolve employee issues or concerns." (Johnson Dep. Tr. 14:5–14.) Johnson had the responsibility to investigate cases of race discrimination for the West Point facility during the relevant period. (Johnson Dep. Tr. 21:8–23:12.)

7. This comment was not investigated by Johnson because he viewed it as part of a grievance Green had filed with human resources and the union. (Johnson Dep. Tr. 56:8–22; 62:11–63:4)

(Johnson Dep. Tr. 62:5–15; Ombuds Case File 01345, Pl.'s Opposition to Summ. J. Ex. I.) Consequently, Fryling allegedly did not discipline Murphy for his hostility toward the African–American employees.

## D. Plaintiff's 5–Day Suspension

Plaintiff alleges that due to his complaints to the Ombudsman, Fryling and Murphy began to conspire against him in order to find any reason to discipline him. (Pl.'s Answer to Def.'s Mot. for Summ. J. 7.) Green points to an e-mail Fryling wrote in October 1997, which discusses a minor error plaintiff allegedly made, stating: "Who has the details? We should be communicating these kinds of things via E-mail so we can all stay in the loop!" (Fryling E-mail Oct. 13, 1997, Pl.'s Opp'n to Summ. J. Ex. J.) Joe McNeill, another Merck supervisor, allegedly warned Green that Murphy had issued a similar oral instruction. (Green Dep. Tr. 139:10–24.)

Green claims that because Murphy and Fryling were unable to attribute any serious production errors to plaintiff, Murphy concocted one. (Id. at 48:9–17; 88:9–16.) On April 14, 1998, plaintiff was working the second shift on the STP line, which Murphy was responsible for scheduling. (Id. at 76:15–18.) In this area, vaccines were prepared for shipping by being sent through a large machine called the "casepacker." (Id. at 70:3–72:4.) Plaintiff worked with other hourly employees, called "fillers," who fill the vaccine vials and manually remove the vaccines from the belt coming out of the casepacker. (Id. at 70:3–5; 72:1–4.) As an LMC, it was Green's responsibility to package the vaccines onto trays called "skids," each of which held sixteen cases of vaccine product. (Id. at 70:5–15.) Plaintiff was also responsible for the "accountability" at the end of his shift—that is, accounting for all the remaining cases of vaccine product that were not packaged into a complete skid. (Id. at 70:5–24; O.A.C.W. Job De-

scription, Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. Ex. 1.) If a third shift was scheduled, Green could leave an incomplete skid of vaccine product to be completed by employees on the third shift. (Green Dep. Tr. 70:23–71:5.) However, if a third shift was not scheduled, plaintiff was responsible for putting the incomplete skid into the cold vault so that the vaccines were preserved for the first shift the following morning. (Id. at 71:5–11.)

On April 14, Green worked with fillers Jacqueline English, Percy Jones, Howard Dill, and Rhonda Carter and mechanic Ken Jerald. (Id. at 71:12–72:14.) Jones was training Carter, who was a new employee. (Id. at 71:18–24.) Shift supervisor Rocco Whitton (a white male) told Green and the fillers that the STP line would not be running during the third shift that evening. (Id at 72:15–73:4.) Accordingly, the second shift was responsible for making sure that the STP line was cleared at the end of their shift and that any product not yet ready for shipping was placed in cold storage. (Id. at 73:23–74:8.) Plaintiff states that at the end of his shift, he put one unfinished partially-filled skid into the cold vault. (Id. at 74:9–14.) While Carter watched, Jones first inspected the casepacker from the floor. (Percy Jones Aff. ¶ 8; Jacqueline English Aff. ¶ 7; Rhonda Carter Aff. ¶ 6; Green Dep. Tr. 77:15–18.) Then he climbed up on a small ladder and confirmed that the machine was empty by viewing it from inside. (Jones Aff. ¶¶ 8–9; Carter Aff. ¶ 6.) Green, English, and Carter also checked the casepacker and found it to be empty. (Jones Aff. ¶ 10; Green Dep. Tr. 77:19–22; English Aff. ¶¶ 7–8; Carter Aff. ¶ 6.) Karen Smith, an employee from the Quality Control department, also came into the room and noted that the casepacker was clear. (Jones Aff. ¶ 12.) Plaintiff finished his paperwork that described the quantity of the shift's production, placed the residual product in the

freezer, and left. (Green Dep. Tr. 73:22–74:18.)

At the beginning of the second work shift on April 15, 1998, the "muster" for the production employees contained no special instructions or unusual developments. (*Id.* at 74:20–75:13.) Nothing was said about any production mistakes. (*Id.*) Nevertheless, later that day, Green was told by another employee, Victor Dunley, that Green was "being set up." (*Id.* at 75:18–76:2.) Dunley said that Olga Jackson—a first-shift African–American LMC who was a "drinking buddy" of Jim Murphy—claimed that she found a case and a half of MMR vaccine left in the casepacker from the April 14, 1998 second shift.[8] (*Id.* at 75:23–76:4; 95:2–9.) Green became concerned because Murphy allegedly "set up" another employee, Roger Moore, in the same manner approximately eight months prior. (*Id.* at 76:14–77:10.) Green went to Murphy and told him the allegations were untrue because he was sure the casepacker was empty due to Jones' training activities and his own actions. (*Id.* at 77:11–23.) Murphy showed Green the vaccine product that Jackson allegedly had found. (*Id.* at 77:23–78:3.)

Plaintiff then spoke with Fryling, Fryling's supervisor Jeanne Stahl, Marilyn Hass, the Human Resources employee assigned to oversee Department 285, Johnson, and Joseph Pulli, Haas's supervisor, telling them he believed he was being set up by Murphy. (*Id.* at 78:9–79:21.) Plaintiff told these individuals that he was being set up because he previously complained of racist behavior in Department 285, primarily by Murphy. (*Id.* at 98:5–21.) Pulli

suggested Green should consider transferring to another department. (*Id.* at 88:4–8.) Plaintiff's request for fact-finding investigation was resisted by Fryling, who stated "I know how to run my department." (*Id.* at 78:16–18.)

On April 28 or 29, Green learned he was going to receive a 5–day suspension. (*Id.* at 80:4–5.) Green then approached Bobby Wilson, the union president, who intervened and asked for an investigation. (*Id.* at 80:9–81:9.) On May 7, 1998, Manufacturing Area Heads Christopher Pastore and Kathy Prue informed Green that he had received a suspension. (*Id.* at 81:17–82:19; Notice of Discipline, Mot. for Summ. J. Ex. B.) Plaintiff again asked for a fact-finding investigation, and Pastore told him that an investigation had already been conducted by Whitton. (Green Dep. Tr. 82:16–19.)

Plaintiff filed a grievance on May 14, 1998, and was represented by his Union steward. (*Id.* at 105:1–107:8.) After Whitton replied to plaintiff's grievance, Merck appointed Pastore and Hass to investigate. (Joseph Pulli Dep. Tr. 101:22–102:2; Christopher Pastore Dep. Tr. 173:24–174:24.) Pastore—who had been at Merck for less than two years—conducted various fact-finding meetings, as well as a "second-step" meeting on June 11, 1998.[9] (Grievance # 285–98–14, Mot. for Summ. J. Ex. E.) While Pastore interviewed Carter, Jones, and English, he disregarded their unequivocal statements that the STP line had been properly cleared. (Jones Aff. ¶ 15; Green Dep. 84:15–23; English Aff. ¶ 9; Carter Aff. ¶ 10.) Pastore did

---

**8.** However, it was not Jackson's job to check the machine at the beginning of the shift. (*Id.* at 93:20–23.)

**9.** Pastore's second-step answer on the grievance form indicates that Green was at the second-step fact-finding meeting. (Grievance # 285–98–14, Mot. for Summ. J. Ex. E.) How-

ever, Green claims this is untrue and that he, Jones, and Jackson were not at the second-step meeting. (Green Dep. Tr. 84:8–14; 107:9–18.) Pastore admits in his deposition that Green and Jackson were not at the fact-finding meeting. (Pastore Dep. Tr. 174:22–175:6.)

not interview plaintiff, who allegedly made the mistake, or Jackson, who allegedly discovered the mistake. (Green Dep. Tr. 82:20–83:2.) No one from the first shift on April 15, 1998, who would have likely seen if any product had been left out, was questioned. (Green Dep. Tr. 103:22–24.) Instead, Pastore denied the grievance. (Grievance # 285–98–14, Mot. for Summ. J. Ex. E.) According to Green, he expected the Union to pursue his grievance to the third step, which it never did. (Green Dep. Tr. 108:4–13.) As a result, the 5–day suspension stood.

### E. Murphy's "Animal E-mail"

Plaintiff alleges that after his suspension, Murphy was essentially given a blank check to continue his behavior. On July 14, 1998, Murphy sent an electronic mail message to other Department 285 supervisors that referred to the third-shift African–American men that reported to him as "my animals." (Murphy Dep. 150:4–151:9; 206:22–207:4; 212:22–213:2.) Specifically, the e-mail stated:

> I HAVE SCHEDULED ADDITIONAL VACATION FOR THE FOLLOWING DATES. PLEASE ARRANGE COVERAGE SO MY ANIMALS WILL FEEL ATTENDED. PLEASE NO RAW MEAT THIS TIME! I HAD A HECK OF A TIME GETTING THEM BACK ON A DRY FOOD DIET THE LAST TIME YOU GUYS COVERED FOR ME.

(Murphy E-mail July 14, 1998, Pl.'s Opp'n to Summ. J. Ex. P.) Murphy sent this e-mail twice more on August 7, 1998. (Murphy E-mail Aug. 7, 1998, Pl.'s Opp'n to Summ. J. Ex. P; Murphy Dep. Tr. 151:24–153:24.)

The response of Murphy's supervisors to this e-mail is disputed. Fryling testified he was not surprised by Murphy's behavior and believed that Murphy did not need to be disciplined for circulating the e-mail

the first time. (Fryling Dep. Tr. 170:2–13; 89:2–6.) He did not speak with Murphy about the e-mail after its first dissemination. Rather, Fryling claims that he told Pastore to tell Murphy that if Murphy distributed something like that again, Fryling would "cut his balls off." (*Id.* at 88:5–8.) Fryling also claims that Pastore told Fryling that Pastore had counseled Murphy regarding the inappropriateness of the e-mail. (*Id.* at 89:7–14.) On his part, Pastore testified at his deposition that he does not recall Fryling ever instructing him to discipline Murphy, and that he certainly would have remembered being told to threaten Murphy with castration. (Pastore Dep. Tr. 199:1–120:10.) When Pastore was confronted with Fryling's testimony, Pastore testified at his deposition that Fryling had lied under oath. (*Id.* at 120:24–121:6.) At his deposition, Murphy testified that no one contacted him between the first and second/third disseminations of his e-mail. (Murphy Dep. 151:10–152:13.) The only related "discussion" that Murphy could recall occurred when Fryling offhandedly told him not to "use the word 'animal.'" (Murphy Dep. 157:8–23.)

In August 1998, Green found out about the e-mail, after a supervisor who received the e-mail showed it to an hourly employee. (Green Dep. Tr. 97:13–17.) Plaintiff and a number of other Department 285 employees (primarily, but not exclusively, African–American) filed a union grievance in which they requested that Merck perform an investigation. (*Id.* at 98:4–10; Grievance Aug. 18.1998, Pl.'s Opp'n to Summ. J. Ex. Q.) At that time, Fryling and/or Pastore orally directed Murphy to apologize to anyone who was offended by his e-mails, and to admit what the e-mail had said during his apology. (Murphy Dep. Tr. 206:10–20; Fryling Dep. Tr. 94:9–14; Pastore Dep. Tr. 122:3–123:25.)

Despite the fact that other Department 285 employees complained about the e-mail, Murphy asked only his direct reports, all of whom were African–American, to attend his apology session on August 12, 1998. (Murphy Dep. Tr. 205:2–9; Fryling 96:11–22.) Murphy also excluded the mechanics who worked the third shift, who were white. (Green Dep. Tr. 99:6–10; Murphy Dep. Tr. 205:10–206:20; Pastore Dep. Tr. 129:2–5.) Murphy admitted that he did so because the employees to whom he was referring as "his animals" were the African–Americans on the third shift. (Murphy Dep. Tr. 206:22–207:4; 212:22–213:2.) Murphy refused to tell the employees what the e-mail said, saying "if you don't know, you don't need to know." (Murphy Dep. Tr. 208:13–19; Fryling Dep. Tr. 95:14–23.)

The Ombudsman's office opened an investigation of Murphy's "animal" e-mails and related misconduct sometime in August 1998. (Johnson Dep. Tr. 63:5–65:2.) Fryling stated in his interview with Johnson, in response to the African–American employee's complaints, "you know how they are." (Fryling Dep. Tr. 53:14–56:23.) He admitted that he "minimized" concerns that the e-mail was a "racially motivated document." (*Id.* at 82:5–84:15.) The Ombudsman found that "there was generally a benign passivity among and across 13 of the 15 supervisors and 2 levels of management regarding the concerns of affected employees" and that the supervisors repeatedly defended Murphy's comment as "just trying to be funny/humorous/sarcastic." (Ombuds Final Summary Sept. 28, 1998, Pl.'s Opp'n to Summ. J. Ex. S.) The Ombudsman determined that Murphy's e-mail was "inappropriate and insensitive" but refused to make any conclusion regarding whether it was racist or racially derogatory. (Green Dep. Tr. 99:22–100:3; Johnson Dep. 65:5–66:11.) Murphy was cited for "poor leadership" and a "lack of sensitivity towards others." (Ombuds Final Summary Sept. 28, 1998, Pl.'s Opp'n to Summ. J. Ex. S.)

However, Murphy was not terminated or suspended—rather he was reprimanded and transferred in September 1998 into the Vaccine Planning Unit, from which he retired in December 1998 and received ten months salary and full benefits. (Murphy Dep. Tr. 38:8–39:7; 165:6–166:8; 173:15–16.) Fryling received a five-percent raise—along with a letter of reprimand—though his raise was in excess of the 4.5% raise that was recommended for someone at his grade level. (Fryling Dep. Tr. 38:20–40:22.) He also was transferred to another department where he no longer had any direct reports. (*Id.* at 117:6–118:21.) Despite receiving a letter of reprimand, Pastore also received a three to five percent raise. (Pastore Dep. Tr. 39:10–25; 41:18–22.)

**F. Plaintiff Files a Charge with the EEOC**

Plaintiff filed a charge of race discrimination and retaliation with the Equal Opportunity Commission ("EEOC") on January 26, 1999, alleging a "pattern of racial discrimination and racial harassment" against him and other African–American employees that created a "hostile work environment." (Charge of Discrimination, Pl.'s Opp. to Summ. J. Ex. V.) Also, on January 27, 1999, Green, as part of the putative class, filed a class action complaint against Merck with the United States District Court for the Eastern District of Pennsylvania alleging violations of Title VII. Merck was notified of the EEOC charge on March 10, 1999, and on March 29, 1999, the EEOC issued a Notice of Right to Sue.

**G. Plaintiff's Termination**

On Saturday, April 10, 1999, while he was working in the sterile core at 2 a.m., Green felt a sudden urge to urinate. (Green Dep. Tr. 111:9–13.) Green failed to

make it to the men's room, and admits to committing a serious error in judgment when he instead urinated in a garbage receptacle in the sterile gowning area. (*Id.* at 110:15–111:24.) Moreover, Green did not clean the urine from the area and forgot to tell anyone about the urine in the trash receptacle. (*Id.* at 112:2–14.) The urine was discovered later that morning by a service worker. (*Id.* at 112:10–13.)

Green alleges that because of his embarrassment, his experiences surrounding his suspension, and the fear that he would be fired, he did not take responsibility for the incident until April 24, 1999. (*Id.* at 112:14–113:12.) Furthermore, when questioned about the incident, Green admits he initially lied to Merck management. While plaintiff originally stated he went outside the sterile gowning room after he urinated and changed his gown, plaintiff actually never left the sterile gowning room. Rather, he regowned in the gowning room and then sterilized his hands once he reentered the core. (*Id.* at 112:2–115:2.) Green's lie was allegedly discovered through a review of computerized card access records which established that he had entered the sterile core only once.

Green argues in his defense that his judgment was impaired due to extreme sleep deprivation. At the time of the incident, plaintiff was working over twenty hours a day, Monday through Friday, as well as full shifts at Merck on weekends. (Expert Witness Op. by Merrill M. Mitler,

Ph.D., Pl.'s Opp'n to Summ. J. Ex. W). At the time, Merck officials knew Green was overextended, and records demonstrate Merck knew he suffered from lack of sleep. (*Id.*) However, Merck never limited Green's hours out of concern that he could pose a safety risk. While Green admits his behavior posed a risk to the integrity of the vaccines, the record contains no evidence that there was contamination of any Merck product, the sterile core, or the changing area. (Arbitration Op. & Award, Mot. for Summ. J. Ex. G.)

After discovering Green's responsibility, Merck discharged Green on April 29, 1999, stating that:

> Given the seriousness of this extremely outrageous misconduct, along with your acknowledgment that you acted willfully in failing to clean or report the incident, a decision has been made to terminate your employment. Moreover, since you are at the top of the progressive discipline ladder, and since your recent misconduct independently warrants termination, a consideration of all the facts indicate there is no basis to mitigate this termination decision.

(Notice of Discipline, Mot. for Summ. J. Ex. F.) [10]

Plaintiff filed a grievance over his termination, and the Union represented him, taking his grievance to arbitration on June 7, 1999. (Green Dep. 117:14–119:16.) After considering the testimony of the parties, the arbitrator found that:

---

**10.** Merck's Employee Conduct Manual states that "dischargeable" offenses are "violations which are considered acts of dishonest, destruction or disruption, acts that threaten the health or welfare of fellow employees or other persons and other violations we consider extremely serious." (Merck Employee Conduct Manual 5, Mot. for Summ. J. Ex. H.) Examples of violations listed in the manual include: "falsifying relevant information or testimony when the Company is investigating possible rules violations, accidents or production prob-

lems" as well as "serious safety violation[s] or gross carelessness which endangers life, limb or Company property." (*Id.* at 6.) However, as noted above, the manual states that discipline can deviate downward based on mitigating circumstances and "mitigating circumstances will be considered at all levels of discipline." (*Id.* at 1.) Mitigating circumstances consist "of all relevant facts such as length of service, unusual events or information surrounding a specific violation and the employee's overall record." (*Id.*)

The Grievant's employment record, even with the disciplines he received (and is appealing) demonstrates that he was a dedicated and hard worker.

Ordinarily, as the Union's attorney has vigorously argued, I would take into account the Grievant's record, his length of service with the Company, and his sincerity as a witness, all of which would mitigate in favor of reducing the penalty imposed by the Company.

In this instant case however, the offenses are so serious, literally risking life and limb of thousands of innocent people with a contaminated vaccine, and the Company's investigation has been so thorough and so fair, that I cannot find any grounds on which to reduce the penalty to anything less than discharge. The grievance, therefore, is denied.

(Arbitration Op. & Award, Mot. for Summ. J. Ex. G.)

After his termination, Green suffered suicidal thoughts and severe depression and was treated with counseling and medication. (Green Dep. Tr. 156:13–157:1; Medical Evaluation, Pl.'s Opp. to Summ. J. Ex. Z.) The social worker and the psychiatrist who evaluated the plaintiff noted that plaintiff's experiences at Merck were the root cause of Green's depression. (Medical Evaluation, Pl.'s Opp. to Summ. J. Ex. Z.)

## II. LEGAL STANDARD

A court may only grant a motion for summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro.

56(c). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 743 (3d Cir.1996) (citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[a]ll justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* "Summary judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy,* 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

## III. DISCUSSION

### A. Hostile Work Environment

In order to succeed in proving a hostile work environment claim under Title VII,[11] Green must establish that (1) he

11. Green claims Merck's actions violate the provisions of Title VII, which provides that "it

shall be an unlawful employment practice for an employer to fail or refuse to hire or to

suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive;[12] (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability. *Jensen,* 435 F.3d at 449. *See also Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir.2005) (citing *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2001)). In short, Green must show "by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee." *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996) (citing *Andrews v. City of Phila.,* 895 F.2d 1469, 1482 (3d Cir.1990) and *Vance v. S. Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989)).

Green bases his hostile work environment claim on a series of escalating incidents that occurred over a one-year period, which the court must view in the light most favorable to Green for the purposes of this motion. These incidents include: (1) his supervisor's comments that he was the "new zookeeper" when he became in charge of the African–American crew on the third shift; (2) his supervisor's administration of disparate and harsh discipline to plaintiff in comparison to that administered to white co-workers; (3) the failure of Merck management to address his supervisor's behavior after plaintiff complained through the proper channels; (4) the increased scrutiny he received from his supervisor after he complained about his supervisor's discriminatory behavior; (5) the subsequent concoction by his supervi-

sor of a fabricated production error by plaintiff in order to arrange for his suspension; (6) the failure of Merck to conduct a fair and impartial investigation; and (7) the continued referral to plaintiff and members of his race as "animals" and "my animals" by his supervisor. Merck argues that these events do not constitute intentional racial discrimination, are not severe or pervasive, did not detrimentally affect plaintiff and, even if they did, would not have detrimentally affected a reasonable person of the same protected class in his position.

■ First, in order to demonstrate intentional discrimination due to race, a plaintiff is not required to present direct evidence of his harasser's motivation for discrimination against him. *Abramson v. William Paterson Coll.,* 260 F.3d 265, 278 (3d Cir.2001). Nor is a plaintiff required to prove that his harasser's intent was to create a discriminatory environment. *Id.* Rather, because "discrimination is 'often simply masked in more subtle forms,'" the intent to discriminate can be inferred from circumstances that demonstrate that race was a substantial factor in the discrimination. *Aman,* 85 F.3d at 1082; *Andrews,* 895 F.2d at 1482; *Abramson,* 260 F.3d at 278. "Regardless of what a harasser's intention is, a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that his 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Abramson,* 260 F.3d at 279 (citing *Harris*

discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1).

**12.** In *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir.2006), the United States Court of Appeals for the Third Circuit clarified that discriminatory harassment must be "severe or pervasive," as opposed to "pervasive and regular," in accordance with Supreme Court precedent. 435 F.3d at 449 n. 3.

*v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ Merck argues that references to being a "zookeeper" of an all African–American crew or referring to one's African–American charges as "my animals" could not be interpreted as embodying racial animus.[13] Viewing the facts in the light most favorable to Green, I disagree. The Third Circuit has found that the use of "code words," such as those under these circumstances, may violate Title VII. *Aman*, 85 F.3d at 1083 (holding that a reasonable jury could determine that words such as "another one," "one of them," "that one in there," and "all of you" were spoken with the intent to discriminate). Indeed, a reasonable jury could conclude that an intent to discriminate was implicit in Murphy's comments. A reasonable jury could find that statements such as "my animals" and "zookeeper," when used in referring solely to African–American employees, "send a clear message and carry the distinct tone of racial motivations and implications. They could be seen as conveying the message that members of a particular race are disfavored and that members of that race are, therefore, not full and equal members of the workplace."

*Aman*, 85 F.3d at 1083. In light of these remarks, I conclude that a reasonable jury could interpret this behavior as "part of a complex tapestry of discrimination" when examined in conjunction with the failure of Merck to take any initial action against Murphy and the circumstances surrounding Green's suspension. *Id.*

■ Merck argues that even if Green could prove these comments were motivated by racial animus, the conduct by Murphy was not "sufficiently severe or pervasive to rise to the level of an objectively hostile work environment." (Memo. in Support of Def.'s Mot. for Summ. J. 20.) In order to determine whether conduct is sufficiently severe or pervasive, it is necessary to consider the "totality of the circumstances." *Andrews*, 895 F.2d at 1482. A hostile work environment analysis must therefore "concentrate not on individual incidents, but on the overall scenario." *Id.* at 1484. Furthermore, the Third Circuit has recognized that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work

---

13. Merck essentially argues that the court's opinion denying class certification was dispositive as to whether Murphy's e-mail was racially motivated, citing the following language:

> [T]he only documented evidence plaintiffs have produced which can even be remotely classified as evidence of racial animus at Merck is a *single* e-mail sent by *one* supervisor in *one* department at *one* facility within the scope of the broadly-defined class. The e-mail itself contains no racial references and refers to employees that includes both whites and blacks.

*Webb, et al. v. Merck & Co., Inc.*, 206 F.R.D. 399, 408 n. 2 (E.D.Pa.2002) (emphasis in original). However, this decision, which determined that the class—spread out over five states and two divisions at six separate facilities—failed to demonstrate commonality or typicality due to a "general policy of discrimination," is materially different than whether a single plaintiff has presented a genuine issue of material fact as to whether he alone was subject to a hostile work environment by particular supervisors in a single department. Since the denial of class certification, the state of the record as to Green's claims has also developed significantly. To the extent that the court previously characterized the email as referring to both white and black employees, a review of Murphy's deposition makes clear that the only employees who directly reported to him were African–American, and that in writing the email, he was referring solely to African–Americans. (Murphy Dep. 150:4–151:9; 206:22–207:4; 212:22–213:2.)

environment claim." *Cardenas,* 269 F.3d at 262.

■ While it is true that simple teasing, offhand comments, and isolated incidents generally do not amount to an actionable Title VII claim, *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), Green presents a totality of the circumstances from which a reasonable jury could find that the harassment was sufficiently pervasive or severe. Viewing the evidence in the light most favorable to Green, over the period of one year, plaintiff was subject to a hostile and intimidating white supervisor who referred to himself as a "zookeeper" overseeing an all-African American crew. Green testified, and Merck never rebutted, that Green was disciplined harshly by Murphy while watching his white co-workers receive no discipline for similar or more severe mistakes. Green was given no relief when he complained through the proper channels about his supervisor's zookeeper comments. Rather, the supervisor's behavior became increasingly inappropriate, resulting in Green's suspension for a fabricated error. Green also learned that the supervisor was making repeated references to Green and the other African–American men on his shift as "my animals," instructing his colleagues on how to "attend" to them while he was vacation, and telling them that they should not feed his charges any "raw meat" because he "had a heck of a time getting them back on a dry food diet the last time." Given this pattern of behavior over the course of a year, I find that a reasonable jury could determine that this conduct is sufficiently abusive, humiliating, and intimidating to constitute severe or pervasive harassment.

■ Moreover, despite Merck's protestations, a jury could also reasonably conclude that Green was detrimentally affected by the environment in Department 285. Plaintiff's evidence amply supports such a

finding, as he sought psychological and psychiatric counseling due to the environment at Merck. *Abramson,* 260 F.3d at 280.

■ Finally, Merck argues that Green fails to demonstrate that a reasonable person in his position would have been detrimentally affected by this conduct. In determining whether Green meets his burden on this element, the court must "look[ ] at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 280 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367). "Mere utterance of an … epithet which engenders offensive feelings in an employee," or "discourtesy or rudeness" that may bother an individual with an eggshell psyche, does not violate Title VII. *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275; *Waite v. Blair,* 937 F.Supp. 460, 469 (W.D.Pa.1995). However, in this case, the conduct could be viewed as beyond "simple teasing, offhand comments, and [nonserious] isolated incidents." *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275. Here, multiple employees signed the petition and grievance with regard to Murphy's inappropriate comments. This, as well as the facts set forth above, leads me to conclude that Green has made a sufficient showing that a jury could find that a reasonable person of his race would find the conduct alleged to be so harmful that it altered his working conditions. I will therefore deny Merck's motion for summary judgment on plaintiff's hostile work environment claim.

## B. Retaliatory 5–Day Suspension

Green also presents a Title VII claim for retaliation. Title VII forbids an em-

ployer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a) (2006). Specifically, Green alleges that Merck's stated reason for suspending him for five days on May 7, 1998—that he left vaccine on the casepacker—was a pretext created by his supervisors so they could suspend him and place him on the brink of termination in retaliation for his complaints about his supervisor's discriminatory conduct. Merck argues this claim should be dismissed because Green has proven neither a prima facie case of retaliation nor that a reasonable jury could find that Merck's suspension was pretext for retaliation.

On summary judgment, the allocation of the burden of proof in federal retaliation cases follows the general Title VII standards. *Moore v. City of Phila.*, 2006 U.S.App. LEXIS 22317, at *25 (3d Cir. Aug. 30, 2006); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997) (citing *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 469 (3d Cir.1993) and *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir.1986)). For Green's retaliation claim, which has proceeded under a "pretext" theory, the Supreme Court's analysis in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) applies.

Under this analysis, a plaintiff bears the initial burden of proof on summary judgment to establish a prima facie case of retaliation. *Woodson*, 109 F.3d at 920. To advance a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) his employer took adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and his employer's adverse action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000). After establishing a prima facie case of retaliation, the burden shifts to the employer to advance a "legitimate, non-retaliatory reason" for its adverse employment action. *Moore*, 2006 U.S.App. LEXIS 22317, at *27; *Shellenberger v. Summit Bancorp., Inc.*, 318 F.3d 183, 187 (3d Cir.2003) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997)).

If the defendant meets this burden, the plaintiff must then "be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 2006 U.S.App. LEXIS 22317, at *25. In other words, at this stage the court must determine whether there is sufficient evidence from which a jury could conclude that the employer's purported reasons for the adverse employment actions were in actuality a pretext for retaliation. *Shaner v. Synthes*, 204 F.3d 494, 501 (3d Cir.2000). At this third stage in the *McDonnell–Douglas* framework, a plaintiff may defeat a motion for summary judgment by pointing to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that retaliation was more likely than not the determinative or motivating cause of the employer's action. *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) and *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1067 (3d Cir.1996)). A plaintiff may cast sufficient doubt on a defendant's legitimate nondiscriminatory reasons by showing "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir.2006) (citing *Fuentes*, 32 F.3d at 765, and *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir.1992)).

▆▆ Finally, I note that while the burden of production may shift at summary judgment, to prevail at trial, a plaintiff must ultimately prove that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Shellenberger*, 318 F.3d at 187 (quoting *Krouse*, 126 F.3d at 500). *See also Woodson*, 109 F.3d at 935 (holding that in a retaliation case, the court must instruct the jury that the plaintiff's protected activity must have had "a determinative effect" on the employer's decision).

### a. Prima Facie Case

As described above, in order to survive Merck's summary judgment motion under the pretext theory, Green bears the initial burden of proof in establishing a prima facie case of retaliation. *Woodson*, 109 F.3d at 920. To advance a prima facie case of retaliation with regard to his five-day suspension, Green must show that: (1) he engaged in an activity protected by Title VII; (2) Merck took adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and Merck's adverse action. *Farrell*, 206 F.3d at 279. While Merck agrees that an employee's suspension constitutes an adverse employment action, it argues that Green has failed to establish a prima facie case because Green's complaints to Johnson do not constitute a protected activity under Title VII, and even if they did, there is no causal connection between them and his suspension.

▆▆ However, viewing the facts in the light most favorable to the non-moving party, Green engaged in protected action when he went to the Ombudsman in the fall of 1997 and complained about Murphy's zookeeper comments. Title VII's anti-retaliation provision protects those who "oppose" discrimination made unlawful by Title VII. *Moore*, 2006 U.S.App. LEXIS 22317, at *21–22. "'Opposition' to discrimination can take the form of 'informal protests of discriminatory employment practices, including making complaints to management.'" *Id.* at *28 (citing *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir.2006)). In order for an employee's conduct to constitute a protected activity, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Id.* at *22. *See also Aman*, 85 F.3d at 1085 (stating that "protesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct.") (citations omitted); *Griffiths*, 988 F.2d at 468 ("a plaintiff need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith, reasonable belief that a violation existed'"). Thus, while all complaints or protests must be more than just "general complaints of unfair treatment," *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir.1995), protection is not lost because an employee might be or is mistaken on the merits of his or her claim. *Slagle v. County of Clarion*, 435 F.3d 262, 268 (3d Cir.2006) (holding that Title VII does not protect against retaliation for filing a claim that is facially invalid because it failed to allege any conduct that was prohibited by Title VII).

Here, Merck argues that Green did not engage in protected conduct when he complained to Johnson about Murphy's use of the term "zookeeper" and the discriminatory treatment of African–American workers. However, a reasonable jury could conclude that Green opposed reasonably perceived unlawful discrimination. As stated above, informal complaints to management such as those in this case can constitute "opposition" to discrimination. *Moore*, 2006 U.S.App. LEXIS 22317 at *28. Here, there is nothing vague or equivocal about Green's complaints—it is clear they were specific protests against racial discrimination and were not just "general complaints of unfair treatment." *Barber*, 68 F.3d at 702. Furthermore, Green opposed conduct—specifically Murphy's statements and his disparate treatment of African–American workers—that a reasonable person could believe violated Title VII's standard for unlawful discrimination. *Moore*, 2006 U.S.App. LEXIS 22317, at *33. From this evidence, a jury could reasonably determine that when Green complained to Johnson, he was acting in a good faith belief that his right to be free from discrimination was violated. *Aman*, 85 F.3d at 1085. Therefore, Green's complaints to Johnson are sufficient to establish that he engaged in a protected activity under Title VII.

In addition, Green has presented evidence sufficient to raise the inference that his protected activity was the likely reason for his suspension. While a plaintiff may demonstrate causation through temporal proximity between the protected activity and termination, or an ongoing pattern of antagonism, a court may also infer causation through evidence gleaned from the record as a whole. *Farrell*, 206 F.3d at 281; *Abramson*, 260 F.3d at 288; *Aman*, 85 F.3d at 1085; *Woodson*, 109 F.3d at 920–21. Such evidence includes inconsistencies surrounding the adverse action itself, inconsistencies in the employer's reasons for taking the adverse action, the employer's conduct towards others, and whether the employer maintains an "atmosphere of condoned harassment." *Farrell*, 206 F.3d at 281.

Viewing the evidence in the light most favorable to Green, I conclude that Green has provided enough circumstantial evidence from which a causal connection may be inferred between his complaint to Johnson and his suspension. First, and most damaging to Merck's motion for summary judgment, are the circumstances surrounding Green's suspension. Green presents strong evidence to support the reasonable conclusion that Murphy fabricated the casepacker incident and that Merck's subsequent investigation was unfair. The lack of evidence supporting Murphy's version of events and the disregarding of all witness statements during Merck's investigation supports Green's claim that the motive behind the suspension was retaliatory. This claim is buttressed by Green's e-mail evidence that Murphy and Fryling subjected him to coordinated scrutiny during the five-month period between his complaint and his suspension—evidence from which a reasonable jury could find that Murphy and Fryling knew of Green's complaint and were hoping to catch him making a reprimandable error during that time. Furthermore, the lack of an investigation by Johnson, coupled with Fryling's comments and his continued apathy toward Murphy's inappropriate behavior, could also support a conclusion that Fryling and Murphy were acting in a permissive environment in which they engaged in retaliatory conduct against Green. *Woodson*, 109 F.3d at 923 ("Evidence of condoned harassment can support an inference by the fact-finder that the employer, having failed to respond to the harassment, also engaged in retaliatory conduct against the plaintiff."); *see also Glass v. Philadelphia Elec. Co.*, 34 F.3d 188, 195 (3d Cir.1994) ("an atmo-

sphere of condoned [racial] harassment in workplace increases the likelihood of retaliation for complaints in individual cases."); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1303 (3d Cir.1997) (noting that if a harasser "got away with the harassment, it is more likely that he or she will believe that retaliation will be safe as well, and conversely, if the employer took prompt and adequate action against the harasser, the harasser will be less confident of his or her ability to engage in retaliation with impunity"). These facts, combined with Green's unrebutted testimony that his complaint to Johnson was public knowledge, are sufficient to withstand Merck's motion to summary judgment on the ground that Green has failed to establish a causal link between his complaint and his suspension.

### b. Pretext

■ As Merck has articulated some legitimate nondiscriminatory reason for Green's suspension—that Green left MMR vaccine in the casepacker—Green must raise a genuine issue of material fact as to whether Merck's stated reason was pretext for retaliation. *Shaner*, 204 F.3d at 501. As discussed above, Green must present evidence from which a factfinder could reasonably either (1) disbelieve the Merck's articulated legitimate reason for the suspension; or (2) believe that retaliation was more likely than not the determinative or motivating cause of Merck's ac-

tion. *Id.* (citing *Fuentes*, 32 F.3d at 764 and *Sheridan*, 100 F.3d at 1067). To do so, Green may rely on direct or circumstantial evidence to " 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in [Merck's] proffered legitimate reasons so as to permit a reasonable factfinder to infer that the [Merck] did not act for the proffered reasons." *Id.* at 503 (quoting *Fuentes*, 32 F.3d at 765).

■ Viewing the evidence in the light most favorable to the non-moving party, Green has presented sufficient evidence for a reasonable jury to disbelieve Merck's articulated reason for suspending him. A reasonable factfinder could conclude from the evidence that the entire casepacker incident was fabricated by Murphy, that Murphy harbored racial animus against his African–American employees, and that Murphy fabricated this incident in order to retaliate against Green for complaining to Johnson. In short, Green has presented such weaknesses and improbabilities in Merck's reasoning for the suspension that a reasonable factfinder could rationally find them "unworthy of credence." Consequently, Merck's summary judgment motion on Green's retaliation claim will be denied.

## C. Discriminatory Discharge

Utilizing the "mixed motive" theory,[14] Green also alleges that Merck's decision to

**14.** With regard to his discriminatory discharge claim, Green specifically relies solely on the mixed-motive theory. (*See* Pl.'s Answer to Def.'s Mot. for Summ. J. 35; Pl.'s Sur–Reply to Def.'s Mot. for Summ. J. 12.)

The mixed-motive theory stems from the Supreme Court decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In *Price Waterhouse*, the Court determined that where both legitimate and illegitimate reasons motivated an adverse employment decision, an employer could still "avoid a finding of liability ... by proving

that it would have made the same decision even if it had not allowed [the protected characteristic] to play such a role." 490 U.S. at 244, 109 S.Ct. 1775. At that time, however, "the Court was divided over when the burden of proof may be shifted to an employer to prove the affirmative defense." *Desert Palace v. Costa*, 539 U.S. 90, 93, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

Two years after *Price Waterhouse*, Congress responded by "setting forth standards applicable in 'mixed motive' cases" in two new statutory provisions. *Id.* at 94, 123 S.Ct.

terminate his employment on April 29, 1999 was partially based on discriminatorily-administered discipline and therefore violated Title VII. However, I conclude that even viewing the evidence in the light most favorable to Green, he has failed to make out a discriminatory discharge claim.

 In a mixed-motive claim, a plaintiff has the initial burden of demonstrating that his employer's adverse employment action was "the result of mixed motives (i.e., that it is the 'result of multiple factors, at least one of which is illegitimate' and the illegitimate factor played 'a moti-

vating part' in the adverse decision)." [15] *Watson v. SEPTA,* 207 F.3d 207, 215 (3d Cir.2000) (quoting *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. 1775). The plaintiff must present "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor" in Merck's decision to terminate his employment. *Desert Palace,* 539 U.S. at 101, 123 S.Ct. 2148; *Higgins,* 2004 WL 2850079, *6, 2004 U.S. Dist. LEXIS 24907, at *18. Even if a plaintiff succeeds in showing intentional discrimination in a mixed motive case, the defendant

2148. The first establishes an alternative for proving that an "unlawful employment practice" has occurred: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating* factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m) (emphasis added). The second provides that if a plaintiff proves a violation of § 2000e–2(m), the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to the plaintiff. 42 U.S.C. § 2000e–5(g)(2)(B). In order to avail itself of the affirmative defense, the employer must "demonstrate that [it] would have taken the same action in the absence of the impermissible motivating factor." § 2000e–5(g)(2)(B). If the employer meets it's burden, the only available remedies to the plaintiff include declaratory relief, certain types of injunctive relief, and attorney's fees and costs. § 2000e–5(g)(2)(B).

However, Congress's response did not resolve all questions with regard to the mixed-motive test. Rather, courts of appeal remained divided over whether a plaintiff needed to present direct evidence that an impermissible consideration was a "motivating factor" in an adverse employment action in order to obtain a mixed-motive instruction. *Desert Palace,* 539 U.S. at 95, 123 S.Ct. 2148. This conflict was subsequently resolved in *Desert Palace v. Costa,* where the Supreme Court ruled that order to obtain an instruction under § 2000e–2(m), a plaintiff "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of

the evidence, that [race] was a motivating factor for any employment practice." 539 U.S. at 101, 123 S.Ct. 2148. Following the "conventional rule of civil litigation [that] generally applies in Title VII cases," the Supreme Court determined that plaintiff may prove a mixed motive case "using direct or circumstantial evidence." *Id.* (alteration in original) (citing *Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)).

15. Here, there is no dispute between the parties that Green's claim meets the first three elements of a prima facie case of discriminatory discharge: (1) that he is a member of a protected class; (2) he was qualified for an employment position; and (3) he was discharged from that position. *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 (3d Cir.1995) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). Thus, the only question that remains is whether plaintiff sufficiently demonstrated that race was a motivating factor behind plaintiff's termination. *Desert Palace,* 539 U.S. at 101, 123 S.Ct. 2148. *See also Higgins v. Hosp. Cent. Servs.,* 2004 WL 2850079, *6, 2004 U.S. Dist. LEXIS 24907, *18 (E.D.Pa. Dec. 9, 2004) (holding that under a mixed-motive analysis, plaintiff must prove the first three elements of a prima facie case of discriminatory discharge as well as establish by a preponderance of the evidence that a defendant's articulated reason for termination, while true, is only one of the reasons for its conduct and another motivating factor is plaintiff's race); *Lloyd v. City of Bethlehem,* 2004 WL 540452, **4–5, 2004 U.S. Dist. LEXIS 3639, *13 (E.D.Pa. Mar. 4, 2004) (same).

can still avoid liability for money damages by demonstrating by a preponderance of the evidence that the same decision would have been made even in the absence of the impermissible motivating factor. 42 U.S.C. § 2000e-(5)(g)(2)(B).

■ In his answer to Merck's motion for summary judgment, Green admits that Merck has articulated and terminated him based, at least partially, on a nondiscriminatory reason—his urination in a sterile area, his failure to clean it up, and his failure to honestly report the incident for several weeks. (Pl.'s Answer to Def.'s Mot. for Summ. J. 35.) However, Green argues that his termination was *also* partially due to his disciplinary history, and because that history includes discriminatorily-applied discipline, his termination "gives rise to an inference of unlawful discrimination." (*Id.*) Green's sole evidence to support his claim is Merck's discharge statement, which noted that "since you are at the top of the progressive discipline ladder, and since your recent misconduct independently warrants termination, a consideration of all the facts indicate there is no basis to mitigate this termination decision." (Not. of Discipline, Mot. for Summ. J. Ex. F.) However, the independent arbitrator's decision to uphold Green's termination did not rely on Green's prior discipline at all:

> Ordinarily ... I would take into account the Grievant's record ... which would mitigate in favor of reducing the penalty imposed by the Company. In the instant case, however, the offenses are so serious, literally risking life and limb of thousands of innocent people with a contaminated vaccine, and the Company's investigation has been so thorough and so fair, that I cannot find any grounds on which to reduce the penalty to anything less than discharge.

(Arbitration Op. & Award, Mot. for Summ. J. Ex. G.)

Viewing the evidence in the light most favorable to Green, Green has not presented sufficient direct or circumstantial evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race or his prior discriminatory discipline was a motivating factor in Merck's decision to terminate his employment. *Desert Palace*, 539 U.S. at 101, 123 S.Ct. 2148. Green produced no documentation or witnesses that showed Merck considered Green's race in his termination. Neither Murphy nor Fryling was involved in his termination. Green presents no evidence showing that his position "was ultimately filled by a person not of the protected class," or that another individual not in the protected class committed similar acts and was not discharged. *Sheridan*, 100 F.3d at 1066 n. 5.

Nor has Green presented any evidence that he would have been retained by Merck if he had a clean disciplinary record. Green's actions could have potentially led to the contamination of Merck's vaccines and serious injury to many innocent people who received them. By urinating in a sterile area, failing to clean it up, and then lying about it, Green committed at least two offenses that are viewed as "dischargeable" offenses according to Merck's Employee Conduct Manual, including "acts of dishonesty," and "acts that threaten the health and welfare of other persons." (Merck Employee Conduct Manual 5, Mot. for Summ. J. Ex. H.) In addition, the fact that plaintiff's termination was upheld by an indisputably neutral arbitrator—who found that Green's actions also independently warranted termination—supports the conclusion that no reasonable juror could find, by a preponderance of the evidence, that race was a motivating factor in Merck's decision. *See, e.g., Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir.2002) (citing *Alexander v. Gardner–Denver Co.*, 415

U.S. 36, 60 n. 21, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), which states that the amount of weight to be given to a particular arbitration decision is left to the court's discretion and depends on the facts and circumstances of each case); *Edwards v. Merck & Co.*, 2006 WL 1030281, *3, 2006 U.S. Dist. LEXIS 21111, at *10 (E.D.Pa. Apr. 18, 2006) (concluding that a neutral arbitrator's decision to uphold a termination is "highly probative of the absence of discriminatory intent in that termination"). Moreover, the Merck discharge statement, the sole evidence Green relies upon, supports the conclusion that plaintiff's urination in a sterile area "independently" warranted termination, and that this incident alone, not his prior suspension, motivated his termination. This decision was confirmed by the independent arbitrator, who upheld Green's discharge and based his opinion solely on the seriousness of Green's offense.

Accordingly, as there is no genuine issue of material fact as to whether plaintiff has demonstrated by a preponderance of the evidence that race was a motivating factor in his discharge, summary judgment will be entered in favor of Merck on the discriminatory discharge claim.

An appropriate order follows.

### Order

AND NOW, this ——— day of September 2006, upon consideration of defendant Merck & Company's motion for summary judgment (Doc. No. 136), plaintiff Anthony Green's response, Merck's reply, and Green's sur-reply, it is hereby ORDERED that Merck's motion for summary judgment is GRANTED only with regard to plaintiff Green's discriminatory discharge claim and judgment is ENTERED in favor of defendant Merck and against plaintiff Green on that claim. Defendant Merck's motion for summary judgment on plain-

tiff's hostile work environment claim and retaliatory discharge claim is DENIED.